[Crim. No. 2100.   First Appellate District, Division One.—June 25, 1940.]

THE PEOPLE, Respondent, v. HYMAN RICHARD WIE-ZEL, Appellant.

William F. Herron and John Herron for Appellant.

Earl Warren, Attorney-General, William F. Cleary and Dennis Hession, Deputies Attorney-General, for Respondent.

KNIGHT, J.—Defendant was charged in an indictment with five counts of grand theft and a prior conviction of burglary. He admitted the prior conviction, and pleaded not guilty to each count of the indictment. Subsequently, on motion of the district attorney, the fourth and fifth counts were dismissed; and upon a second trial the defendant was found guilty by a jury on each of the first three counts. He was sentenced to imprisonment in the penitentiary, the sentences on all three counts to run concurrently. From the judgment of conviction and the order denying a new trial, he appeals.

Count one of the indictment charged appellant with having on June 17, 1938, unlawfully taken cigarettes belonging to Morris Benatar and Tessie Benatar, copartners doing business under the name of Benatar's Cut Rate Drug Store, of the value of about $374.75; count two, with having on December 19, 1938, unlawfully taken cigarettes from Benatar's of the value of about $214.25; and count three, with having on December 21, 1938, unlawfully taken cigarettes from Benatar's of the value of about $239.95.

It was the prosecution's claim that appellant, an employee of Benatar's, without the knowledge and consent of his employers and without their authority, ordered certain quantities of cigarettes from a wholesale house, in addition to the cigarettes regularly ordered by Benatar's, which, including the cigarettes regularly ordered, were delivered to appellant in his capacity of stockroom clerk, and that he appropriated the additional cigarettes to his own use, delivering to the store only those regularly ordered.

Insufficiency of the evidence is urged as first ground for reversal. In support of its claim the prosecution produced evidence establishing the following facts: Benatar's maintains two retail stores in San Francisco, one at 807 Market Street, and the other in the Crystal Palace Market. Both stores have stockrooms, the one for the Crystal Palace store being on Stevenson Street, a blind alley which runs into the store from Seventh Street. Appellant was the brother-in-law of the manager of the Crystal Palace store, and was through the latter placed in the sole and exclusive charge of the stock room. His employment began on February 24, 1936, and ended on January 27, 1939, when he was discharged for intoxication.

Subsequent to February, 1938, the procedure followed in ordering cigarettes for the Crystal Palace store was as follows: The manager of the tobacco department, on Tuesdays, Thursdays and Saturdays, wrote out an order for the number of cigarettes which would be needed for that department of that store for the next two days. The order was made in duplicate. The copy was kept at the Crystal Palace store, and after the store closed the manager took the original of this order to the store at 807 Market Street, which was the main store where the books and accounts were kept for both stores. The following morning, before 9 A. M., the order was picked up by the assistant storeroom clerk of the 807 Market Street store, and he checked any orders for *tobacco* or other merchandise which he could fill from the storeroom of that store, but he did not fill any orders for *cigarettes* from that storeroom. All cigarettes were ordered directly from the wholesale house. He then put a cross opposite any orders he could not fill from his storeroom, and took the order to the tobacco buyer, who, if he approved the order for cigarettes, authorized the assistant storeroom clerk to phone to the whole-

sale house for the cigarettes. The latter phoned the order so authorized about 9 or 9:15 in the morning, and the clerk at the wholesale house wrote down the order, and then an invoice was made out in triplicate—an original or white copy, a yellow copy, and a pink copy. The cigarettes were then delivered by the wholesale house some time before noon, together with the white and yellow copies of the invoice, directly to appellant at the storeroom of the Crystal Palace store, and he signed both copies of the invoice, returning the yellow copy to the driver for the wholesale house, and retaining the white copy, which was later sent to the 807 Market Street store. The pink copy of the invoice was retained by the wholesale house. It was then the duty of appellant to deliver the cigarettes to the manager of the tobacco department of the Crystal Palace store as soon as the noon rush hour was over. Thereupon the manager of the tobacco department checked the cigarettes so delivered with the copy of the order he had made out, which he had retained, and later sent that copy of the order to the 807 Market Street store. However, the invoices were never checked at the main office with the orders it had received from the manager of the tobacco department of the Crystal Palace store, and the orders were kept for only a couple of months and then destroyed. Payment for the cigarettes was made according to the invoices, which were kept.

Prior to February, 1938, it had been the custom for the wholesale house to deliver the cigarettes directly to the tobacco department of the Crystal Palace store, but the deliveries were usually made at a busy hour, so that the procedure was changed and thereafter the cigarettes were delivered to appellant at the storeroom, and were by him then delivered to the tobacco department when the rush hour was over.

On numerous occasions after this change in the procedure went into effect in February, 1938, additional orders were phoned in to the wholesale house for increased quantities of cigarettes and they were added to the quantity originally ordered, and delivered therewith to appellant at the Crystal Palace storeroom, and the invoices therefor were signed by him. The order clerks from the wholesale house who took the orders over the phone testified that in each instance the voice giving the "add to" order was different from the one that had given the original order, and that the phone calls for the

"add to" quantities were received approximately half an hour after the original order was received by phone. The manager of the tobacco department of the Crystal Palace store, the assistant storeroom clerk and the tobacco buyer of the 807 Market Street store, all testified that they had never at any time ordered, been authorized to order, or authorized anyone else to order any additional cigarettes after the original order had been made out or phoned in. Furthermore, the evidence shows that none of these "add to" orders was phoned in prior to February, 1938, when the system of delivering the cigarettes to the store itself was discontinued, nor after January of 1939, when appellant was discharged. It also shows that although the "add to" orders had been phoned in usually once or twice a week during that period, no such orders were phoned in during the week appellant was on vacation. Many of the invoices were introduced in evidence, but as stated the original and the duplicate order blanks made out by the manager of the tobacco department of the Crystal Palace store with which he checked the quantity of cigarettes delivered to him and which were returned to the 807 Market Street store were kept only a couple of months and then destroyed. However, the original order blanks made out by Benatar's covering the orders for cigarettes for December 19 and December 21, 1938 (involved in counts two and three), together with the orders for those days as they were written down by the clerk at the wholesale house, and the two copies of the invoices for those dates signed by appellant upon the receipt of the cigarettes were not destroyed and were introduced in evidence and brought up as part of the record on appeal. The original order of December 19, 1938, was made out by the manager of the tobacco department of the Crystal Palace store, and called for some 53,200 cigarettes of various brands (in the ordinary packages). The order written down by the clerk of the wholesale house shows this same order, but on a separate sheet there is written an order for some 40,000 more cigarettes, and this marked "add to". The invoices which appellant signed list the original order for 53,200 cigarettes, and separately list the 40,000 called for by the "add to" order. The same situation appears with regard to the December 21st order, except that the original order calls for some 125,000 cigarettes, and the "add to" order is again for 40,000, and appellant signed for the receipt of the total

number. But it appears from the testimony that the manager of the tobacco department of the Crystal Palace store received only the cigarettes that he himself had ordered. Continuing, the evidence shows that a number of "add to" phone orders were made after December 21, 1938, and prior to the discharge of appellant; and that the day after he was discharged an inventory was made of the tobaccos in the storeroom of which he had sole and exclusive charge, and about 34,000 cigarettes were found in the drug department in the storeroom, notwithstanding that it was appellant's duty to deliver to the tobacco department of the store all cigarettes as soon as the busy hour was over—always the same day after their delivery by the wholesale house. No cigarettes were supposed to be kept in the storeroom. Shortly afterwards a complete inventory was taken of the storeroom, but no more cigarettes were found therein.

It further appears from the evidence that appellant's salary was $100 a month, and his brother-in-law, the manager of the Crystal Palace store, with whom he lived, testified that appellant had no other visible means of support; that he worked all day six days a week, and was usually home in bed before 9 o'clock each evening. But the prosecution proved that from March, 1938, which as will be noted was a month after the change in the system of delivery, to January, 1939, when he was discharged, appellant deposited in his personal bank account approximately $3,500, which was greatly in excess of the amount actually received by him as salary during that period.

Evidence was introduced also showing that appellant was negotiating for the sale of cigarettes. In this respect the prosecution produced a witness named Williams, who ran a cleaning and pressing establishment where appellant took his clothes to be cleaned and pressed; and Williams testified that on the night before appellant left on his vacation appellant invited him to have a drink, and that he told Williams at that time that he was "making money" and he exhibited a roll of bills which Williams estimated as being about $300, including one $100 bill; and he told Williams that he was going to give Williams a chance to make some money; that he would sell him cigarettes for $35 a case; whereas the wholesale price of cigarettes at that time was $62.50 a case.

When the prosecution closed its case appellant offered no evidence in his defense, nor did he testify as a witness in his own behalf.

■ In view of the fact that the orders made out by the manager of the tobacco department of the Crystal Palace store for the delivery of the quantity of cigarettes on June 17, 1938, had been destroyed, the manager was unable to testify positively as to the quantity of cigarettes that were delivered to him by appellant as a result of that order. It would appear, therefore, that the conviction of the first count cannot be sustained.

■ We are satisfied, however, that the evidence is legally sufficient to sustain the convictions as to counts two and three. The main features thereof may be summarized as follows: All employees of Benatar's stores, except appellant, having anything to do with the transactions relating to the purchase and disposal of cigarettes, positively denied ever having phoned in any of the "add to" orders; and appellant failed to deny that he had done so. As a result of the "add to" orders appellant personally received and receipted for all extra cigarettes delivered in pursuance of those orders, and all extra cigarettes so received by him were paid for by his employer; but no portion thereof was delivered by appellant to the manager of the tobacco department of the store; and while the extra cigarettes were in his possession as sole and exclusive custodian of the storeroom they disappeared; the phoning of the "add to" orders began as soon as deliveries of the cigarettes began to be made to appellant rather than to the store; they ended when he was discharged, and none was phoned while he was on vacation; during the period the cigarettes were being thus obtained by the "add to" orders appellant was trying to sell cigarettes at half the wholesale price; he received but $100 a month salary, and had no other source of income, and during the period of time these "add to" transactions were going on he was able to bank in his own name some $3,500. ■ As provided by the Constitution (art. I, sec. 13), in any criminal case, whether the defendant testifies or not, his failure to explain or to deny by his testimony any evidence or facts in the case against him may be considered by the jury. Here, as stated, the appellant made no attempt, by his own testimony or otherwise, to contradict, explain or deny' any of the incriminating circumstances established

against him; therefore the jury was entitled to consider that circumstance also in determining his guilt. (*People* v. *Schneider*, 36 Cal. App. (2d) 292 [98 Pac. (2d) 215]; *People* v. *Waller*, 14 Cal. (2d) 693 [96 Pac. (2d) 344].) From the foregoing it will be seen that there could be no justification for holding as a matter of law that the verdicts of the jury on counts two and three lack evidentiary support.

█ Appellant makes the point that the *corpus delicti* was not proved, and that therefore the testimony of the witness Williams was incompetent because, so appellant argues, it involved an "extra-judicial admission, statement or confession" of the appellant. It seems that appellant made no objection to this testimony when it was introduced. █ However, regardless of his failure to object, there is no merit in the point, for while it is doubtless the law, as he contends, that the *corpus delicti* must be proved by evidence outside of declarations or admissions of a defendant, it is well settled that the prosecution is not required to establish it by proof to the same degree of certainty as is required to establish the fact of guilt. Slight or *prima facie* proof is all that is necessary; it may be proved by circumstances shown in evidence, or by inferences reasonably drawn therefrom; direct or positive evidence is not essential; nor is it necessary that such evidence in itself connect the defendant with the perpetration of the offense. (*People* v. *Hudson*, 139 Cal. App. 543 [34 Pac. (2d) 741].) Obviously the facts and circumstances above narrated are amply sufficient to meet the requirements of the foregoing rule.

█ Nor is there any merit in appellant's contention that proof of a demand for the property was essential to a conviction, for the reason that the evidence affirmatively shows that there was a fraudulent appropriation thereof. (See *People* v. *Hill*, 2 Cal. App. (2d) 141 [37 Pac. (2d) 849], and cases cited therein.) █ It is also urged that there is a fatal variance between the allegations of the indictment and the proof, the argument made in this behalf being that the extra cigarettes which it is claimed were misappropriated were the property of the wholesaler and not of Benatar's. The facts already set forth serve as a complete answer to appellant's argument, for they show without conflict that the misappropriation took place after the cigarettes were delivered to and became the property of Benatar's. Furthermore, the·

evidence was sufficient to prove an unlawful misappropriation, without the Benatars having testified personally to that effect; and it appears that the question of the constitutionality of section 952 of the Penal Code, which appellant urges, has heretofore been decided adversely to appellant's contention. (*People* v. *Berg,* 96 Cal. App. 430 [274 Pac. 433].) The remaining points urged in furtherance of the appeal are not, in our opinion, of sufficient importance to require special mention. In accordance with the views herein expressed, the judgment of conviction as to the first count is reversed; and the judgment of conviction as to the second and third counts, as well as the order denying the motion for new trial, are and each of them is affirmed.

Peters, P. J., and Ward, J., concurred.

A petition for a rehearing of this cause was denied by the District Court of Appeal on July 10, 1940, and an application by appellant to have the cause heard in the Supreme Court, after judgment in the District Court of Appeal, was denied by the Supreme Court on July 25, 1940. Carter, J., voted for a hearing.