[Crim. No. 3657.   Second Dist., Div. Three.   Apr. 17, 1943.]

THE PEOPLE, Respondent, v. OSCAR FIERRO, Appellant.

Manuel Ruiz, Jr., for Appellant.

Robert W. Kenny, Attorney General, and Alberta Belford, Deputy Attorney General, for Respondent.

WOOD (Parker), J.—Defendant appeals from a judgment of conviction upon a charge of assault with a deadly weapon, a felony, and from the order denying his motion for a new trial. Trial was by jury. ▮▮▮ His contention on appeal is that the evidence was insufficient to justify the conviction, in that the testimony of the prosecuting witness relative to identification of defendant was inherently improbable.

The victim of the assault testified that he was a member of a group of boys which was known as the "Clanton Street Gang"; that on the afternoon of June 12, 1942, he and about 15 other members of his gang were spectators at a track meet in the Los Angeles Coliseum; that he saw, at the coliseum, about 10 or 12 members of another group of boys which was known as the "First Street Gang"; that a feud existed between the two gangs and it was a "standing proposition" to "beat up on each other" when they met; that a few minutes before the track meet was finished the members of his gang left the coliseum and waited near an entrance to the coliseum, intending to fight the other boys when they came out; that after his gang had waited at the entrance about 10 minutes, someone hollered "There they go," and then the boys of his gang ran after the other boys who were running out of another exit of the coliseum; that they ran after the other gang for a distance of about 60 feet, and then the others stopped, turned around, and stood in a line; that his gang stopped running when the others stopped and at that time the distance between the two gangs was about 40 feet; that the members of his gang then walked toward the other gang; that at that time about 1,500 of the spectators who had been at the track meet were leaving the coliseum and were about 25 feet to the rear of complainant; that when the other gang stopped, he saw the defendant fire a revolver; that the shot which defendant fired struck the complainant on the right side of his head about 4 inches above his ear and knocked him down; that he was conscious but weak; that he saw the gun in defendant's hand when defendant shot him and he saw the smoke from the gun; that when the shot was fired the boys of the other gang, except defendant, ran away; that after complainant had fallen he looked up and saw defendant standing where he was when he shot complainant; that defendant was wearing a brown leather jacket and tan pants, was bareheaded and had kinky black hair; that he saw defendant stand there and stare at complainant about 2 seconds,

and then defendant turned and ran away; that complainant arose after 2 seconds and ran toward the crowd which was to the rear; that he (complainant) testified at the first preliminary hearing that he did not know who shot him (the complaint was dismissed at the first hearing when complainant did not identify defendant); that he so testified because he "was just going to drop the whole matter"; that after defendant confessed there was "no sense of me coming up here and tell a lie"; and that he saw defendant 2 days after the shooting when he (complainant) was in the hospital and the officers brought the defendant before him. Relative to indentifying defendant at the hospital, complainant was asked the following question at the trial, "Was there any question in your mind as to who shot you?" and he answered, "When they brought him in I knew that it was him."

Police Officer Jesse testified that defendant said to him (witness) that he shot complainant at the coliseum, but he didn't mean to do it; that defendant said further that he (defendant) ran about 100 feet and then he stopped, turned around, and fired into the air in the direction of the crowd that he thought was chasing him; that as he was leaving the coliseum two colored boys were fighting and a gun that one of them had in his hand was knocked to the ground and defendant picked it up; that two days later defendant said the gun was given him by another boy, whose name was Ramos, before defendant left the coliseum.

Defendant testified on direct examination that he was at the track meet and that he wore a green sweater and beige pants. He testified further that the reasons he told Officer Jesse he would confess everything were: that another officer (in the absence of Officer Jesse) had hit defendant several times and knocked him down; that Officer Jesse said he might be able to get him in the juvenile court if he would confess; that defendant's fingerprints were on the gun; that a ballistics expert said the gun was the one used in that shooting; that Ramos had admitted that he gave the gun to defendant and that if Ramos, his friend, had said he had given the gun to him defendant did not want to make a liar out of Ramos. On cross-examination he testified that he did not belong to any gang; that he went alone to the track meet; that he did not see anyone there he knew, and he was alone when he left the coliseum; that he did not notice any commotion and heard no shot; that the reason he told Officer Jesse that he saw two colored boys fighting and that one of them dropped the

gun and he (defendant) picked it up was that the officers were going to make him confess and he had to say he got the gun from some place and that was the first thing that came to his mind; that the officers (not including Officer Jesse) kept beating him and he (defendant) said he would agree to anything; that he was struck on the nose (in the absence of Officer Jesse) and his nose bled; that soon after his nose started to bleed, Officer Jesse came in and talked to defendant about 5 minutes but the bleeding was not noticeable because defendant was "breathing in" and he kept the blood in his nose.

The officer, to whom defendant referred when he said he was beaten, testified that he did not strike defendant or use force upon him; that he told defendant that he had arrested a boy by the name of Larado and had found the gun in the back of his automobile, and Larado had said the gun belonged to defendant; that defendant said he did use the gun and that the reason he shot complainant was that he had "heard the Clanton Street Gang was there and they were going to get us" and "I pulled the gun out and I shot."

Another officer, who was present at the time defendant alleged he was beaten, testified in substance the same as the officer just mentioned.

Defendant argues that complainant was stunned and confused to such an extent by reason of the injury to his head that he did not have the mental capacity to comprehend sufficiently the appearance of the person who shot him and therefore he could not identify the person. As a part of the basis for that argument defendant refers to complainant's testimony as follows: "A. . . . after I got shot I got up and ran toward the crowd. Q. What crowd are you talking about now? A. The crowd, the people that was looking. I thought they were going to run toward me and kick me. That was why I ran." Defendant asserts the testimony indicates complainant's mental instability in that he had a hallucination that he was in danger of being kicked by the spectators. He ran toward the spectators, not away from them, and fell upon the ground again. The testimony as a whole shows that complainant was referring to the boys of the other gang and not to the spectators when he used the word "they" in stating that he thought "they were going to . . . kick me." The weight to be given complainant's testimony was a matter to be determined by the jury.

Defendant argues further that the corpus delicti was not established without the admissions of defendant and, therefore, the evidence was insufficient to justify the conviction. The defendant made no objection to the testimony relative to the admissions when it was introduced. It was stated in the case of *People* v. *Wiezel*, (1940) 39 Cal.App.2d 657 [104 P.2d 70], at page 664: "However, regardless of his failure to object, there is no merit in the point, for while it is doubtless the law, as he contends, that the *corpus delicti* must be proved by evidence outside of declarations or admissions of a defendant, it is well settled that the prosecution is not required to establish it by proof to the same degree of certainty as is required to establish the fact of guilt. Slight or *prima facie* proof is all that is necessary; it may be proved by circumstances shown in evidence, or by inferences reasonably drawn therefrom; direct or positive evidence is not essential; nor is it necessary that such evidence in itself connect the defendant with the perpetration of the offense." It is not necessary that the corpus delicti be proved beyond a reasonable doubt before other evidence is introduced which corroborates it or strengthens reasonable inferences drawn therefrom, and if a prima facie case is presented that a crime was committed, the evidence is sufficient. (*People* v. *Ives*, (1941) 17 Cal.2d 459, 463 [110 P.2d 408].)

Concerning the question whether the gun was fired deliberately toward human beings, there was evidence, other than the extra-judicial statements of defendant, that a feud existed between the two groups of boys and it was their custom to fight when they met; and that several boys of one gang were running and were being chased by several boys of the other group, and the boys who were being chased stopped suddenly, turned around, and one of them fired a revolver from a distance of 40 feet toward the other group of boys and toward several hundred persons who were about 25 feet to the rear of those boys. In order to establish the corpus delicti, it is not required that it be proved the crime was committed by the defendant. (*People* v. *Wilt*, (1940) 40 Cal.App.2d 124, 127 [104 P.2d 387].) Under the circumstances it was reasonable to conclude that the person who fired the gun did it with the intent to assault a human being. There was sufficient evidence to establish the corpus delicti.

As to the sufficiency of the evidence concerning identification, a statement applicable to the present case was made in the case of *People* v. *Farrington*, (1931) 213 Cal.

459 [2 P.2d 814], at page 463, as follows: "The strength or weakness of the identification, the incompatibility of and discrepancies in the testimony, if there were any, and the uncertainties of witnesses in giving their testimony were matters solely for the observation and consideration of the jurors in the first instance, and for the consideration of the trial court on motion for a new trial. It has approved the finding of the jury, and on appeal this court may not disturb such finding and the action of the trial court unless we can say, as a matter of law, that there was no evidence to support the conviction." ■ The complainant said he saw the defendant fire the gun. The defendant admitted that he was the person who shot the complainant. Several inconsistent statements were made by defendant. The weight of the evidence and the credibility of the witnesses were matters for the determination of the jury. (*People* v. *Santora*, (1942) 51 Cal.App.2d 707, 711 [125 P.2d 606].) The evidence as to identification of defendant was not inherently improbable, but on the contrary was sufficient to support the verdict of the jury.

The judgment and the order denying the motion for a new trial are affirmed.

Shinn, Acting P. J., and Shaw, J. pro tem., concurred.