[Crim. No. 4683. In Bank. Aug. 16, 1946.]

THE PEOPLE, Respondent, v. DAN LEARY, Appellant.

Morris Lavine for Appellant.

Robert W. Kenny, Attorney General, and Frank Richards, Deputy Attorney General, for Respondent.

CARTER, J.—Defendant Dan Leary and his codefendant William Crain were charged by information 100192 with the following crimes: First count, the murder in November, 1944, in Los Angeles of Frank Ocello; second count, attempted robbery of the same victim; third, fourth and fifth counts, the respective robberies in Los Angeles on December 9, 1944, of Nathan Rack, Joseph B. Mathews and Ellen Landers. Each defendant was also charged with two prior convictions.

Leary pleaded not guilty, not guilty by reason of insanity, and denied the prior convictions. The two defendants represented by separate counsel, were tried jointly. During the course of the trial Leary admitted the two prior convictions. The jury found him guilty of first degree murder as charged in the first count of the information, fixed the punishment at imprisonment for life, and found him guilty as charged in the other four counts. Thereafter, Leary withdrew his plea of not guilty by reason of insanity, and was sentenced to the state prison for the terms prescribed by law, the sentences on the last four counts to be consecutive as to each other and concurrent with the sentence under count one. Judgments of convictions were entered against him and his codefendant Crain, from which appeals have been separately prosecuted. (See *People* v. *Leary, ante,* p. 727 [172 P.2d 34].) Each defendant made a motion for a new trial. The motions were denied.

Another information, 100187, was filed against Leary, Crain, and one Hardeson, charging four robberies committed in Los Angeles on December 15th. These charges were consolidated for trial with those in information 100192, except that a severance was had as to Hardeson. No appeal was taken from the judgments entered pursuant to information 100187.

Leary, in propria persona, filed an opening brief. Later he asked this court to appoint an attorney designated by him to represent him in the further prosecution of his appeal and the request was granted.

The points urged in the original opening brief touch upon the sufficiency of the evidence to support the judgment. An examination of the record reveals a course of criminal activities on the part of Leary, Crain and Hardeson. The facts concerning the murder and attempted robbery charged in counts one and two as well as those concerning the robberies charged in counts three to five are clearly established.

On November 15, 1944, an automobile belonging to Leary was parked in an alley which intersects 47th Street near Western Avenue, Los Angeles. Leary was in the driver's seat and Mrs. Leary occupied the back seat. After some conversation at the parked car Crain and Leary went to a liquor store at the corner of 47th Street and Western Avenue. Crain, armed with a .32 caliber revolver, forced the owner of the store, Frank Ocello, into the rear storeroom where Mr. Linden, an agent of the Department of Internal Revenue, was working. Crain fired one shot at the agent and missed. Crain then turned Ocello back into the main store. The agent heard voices in the store, the crashing of bottles and two shots. He ran from the back entrance of the store and encountered Crain, who with Leary was running along 47th Street toward the alley. Crain again fired at the agent and missed. Ocello was in pursuit of Crain and Leary, but turned back crying out that he had been shot. Crain, Leary and Leary's wife escaped in the automobile. Ocello was taken to the hospital, where a .32 caliber bullet was removed from his back and other surgical operations were performed. He died two weeks later from peritonitis resulting from the gunshot wound.

Identification testimony was given and the occurrence was described in part by agent Linden, by a Mrs. McDermott, who was washing the window of her upper flat over the alley when the automobile parked almost beneath it, by a Mrs. Bryan who was visiting in the lower flat, by Mr. White, the owner of a paint shop on the southwest corner of the intersection, and by Mrs. Ocello, who conducted a pet shop next door to the paint shop.

On the evening of December 9th the three robberies were committed which are the subject of counts three to five of information 100192. About 8 o'clock a man walked into the tailor shop of Nathan Rack, with gun in hand, and said "All your money or you will be killed." Mr. Rack identified Leary as this man. With Leary was another man whom Mr. Rack identified in the courtroom as Hardeson. Leary told Mr. Rack to face the wall, and extracted his pocket book containing $87. Mr. Rack was then told to lie on the floor, which he did, and as the men walked out, he saw Hardeson take three suits of clothes. On December 14th Crain's home was searched by the police and one of the suits was found there.

About 8:15 of the same evening a man with a gun came up to Ellen Landers, the cashier in a theater ticket office, and

demanded all the bills she had, whereupon she gave him $19. She identified Crain as this man. She did not see Leary.

About 9:05 of the same evening a man walked in the cafe of Joseph B. Mathews, pulled a handkerchief off of a gun which he was holding, and said, "Give me your money, I am not fooling; this is a stickup." Mr. Mathews gave him $39 from the cash register, and he left. He was identified as Crain by Mr. Mathews and by a Mrs. Yates, who was sitting at the bar. When he left, Mrs. Yates walked out and saw a car parked across the street. Seated at the wheel was a dark haired man with glasses, but she did not see his face. Crain entered this car and it drove off.

On the evening of December 14th Crain and Leary escaped from the rear of Leary's home while officers were being admitted at the front door. They climbed into the parked car of Mr. Gillespie and, by threatening him with guns, forced him to drive them some distance away. On the following day, December 15th, the four robberies were committed for which convictions were had under information 100187, and which netted the perpetrators considerable cash.

On the evening of December 15th Crain, Leary and Hardeson made a down payment on a LaSalle car bearing license number 08 Z 332. On the 16th a highway patrol officer received a radio message to watch for a LaSalle bearing that number. The car was sighted, the highway blockaded, and several officers shot at the car as it sought to evade the blockade by making a full turn in the road. Leary, slightly wounded, came from the driver's seat, and Crain and Haredson from the other side of the car. Over the embankment on the latter side the officers found two loaded .38 caliber revolvers. About $570 was taken from Leary in loose bills which he was carrying inside his shirt and waist, and currency was also taken from the persons of the other two men.

Shortly before midnight of December 16th a conversation was had in which three of the officers, Crain and Leary participated. One of the officers testified that the following occurred in the course of this conversation: "I [the officer, who knew that on the previous day Mrs. Leary had been taken into custody and had made a full statement to the police], said, 'There is only one thing I would like to know, did Mrs. Leary know, when you men went to the Ocello liquor store, you were going there to commit a holdup?' Crain said, 'No.' Leary shook his head in the negative. I said, 'When did she

first know that you were going there to pull a robbery?' Crain says, 'When we came running out and I told her I shot the old guy.' I looked at Leary and I said, 'Is that right, Dan?' He nodded his head in the affirmative."

Earlier in the evening one of the other officers had a conversation with Leary, had told him Mrs. Leary was in custody, and had given him the substance of the matters contained in her statement. He testified that he then "stated to Leary that I did not think his wife was guilty of anything. Leary then says to me, 'What do you want me to do about it?' And I says, 'I don't want you to do anything about it.' He looked at me and he said, 'I am going to take it the hard way.'"

On December 18th Mrs. Leary was questioned in the presence of Crain, Leary and the officers, and the conversation was transcribed by a reporter. She asserted the correctness of her previous statement, and again said that after Leary parked his car in the alley, Crain and Leary left, saying that they were going to "take" the liquor store; that she then heard shots; and that Crain and Leary came running back to the car and Crain said "that he had shot the man. . . ." Mrs. Leary gave a full account of all details to which she could bear witness. At the close of this questioning the police, according to the officers' testimony, asked the following questions of Crain and Leary and received the following replies: "Q. Bill [Crain], you have heard Mrs. Leary's statement, is there anything you want to add to it or anything you want to say? William Crain: I have nothing to say. Q. How about you, Dan? Daniel Leary: All I can say is I don't like it very much. Q. Do you deny it?" To that question there was no answer. (Reading): "Q. Do you, Bill? William Crain: Well, I'm kind of in the middle here, Captain. Q. Whatever you want to do. William Crain: I am going to deny it."

On December 19th Leary was again questioned by police officers and, according to the testimony of one of them, was asked, "Just what happened out at the liquor store? Was there a fight or did the old man take a swing at Crain, or what happened that he shot him?", and Leary replied, "I don't know just what happened. I saw him scuffling and saw him fall down and I turned and ran out." Leary was also questioned concerning the robberies of December 9th. With respect to the Rack robbery he said that "he had just stepped inside the door and Crain had gone back to the counter where the man was," and that they had taken some suits. He also said they

had "pulled" the hold-up of the theater cashier the same night, that he was driving his own car, and that they also "pulled" the Mathews job.

On December 20th Leary, Crain and Hardeson were questioned concerning the robberies of December 15th, charged in information 100187, and from their replies it appeared that Leary drove the car at that time while his companions committed the several crimes.

After his arraignment at preliminary examination Leary asked an officer if he could read the statement made by Mrs. Leary. The officer brought it to Leary at the county jail on December 23d. After Leary had read it the officer asked him if he had anything to say regarding it, and his only reply, according to the officer's testimony, was to ask "why they separated he and Crain when they put them in the county jail."

On the trial Leary took the witness stand in his own defense and denied certain remarks attributed to him by the officers.

██ In the opening brief prepared by the defendant he argues, under headings one and two, that the corpus delicti as to the murder was not proved as to him, and that the evidence failed to establish the corpus delicti connecting him with any of the other offenses charged in the information. He concedes that the evidence establishes that Mr. Ocello was murdered and that several robberies were committed, but he overlooks the fact that proof of the corpus delicti does not require proof that the crime was committed by the defendant, or that the identity of the perpetrators of the crime be proved. (*People v. Selby,* 198 Cal. 426 [245 P. 426]; *People v. Bollinger,* 196 Cal. 191, 200 [237 P. 25]; *People v. Vertrees,* 169 Cal. 404, 408-9 [146 P. 890]; *People v. Ward,* 134 Cal. 301, 306 [66 P. 372]; *People v. Fierro,* 58 Cal.App.2d 215, 220 [136 P.2d 94]; *People v. Shapiro,* 40 Cal.App.2d 321, 323 [104 P.2d 688]; *People v. Wilt,* 40 Cal.App.2d 124, 127 [104 P.2d 387]; *People v. Carter,* 10 Cal.App.2d 387, 388 [52 P.2d 294]; *People v. Meyers,* 7 Cal.App.2d 351 [46 P.2d 282]; *People v. Cowling,* 6 Cal.App.2d 466, 471 [44 P. 441]; *People v. Durborow,* 130 Cal.App. 615, 618 [20 P.2d 708]; *People v. Sameniego,* 118 Cal.App. 165, 169 [4 P.2d 809, 5 P.2d 653]; *People v. Strider,* 96 Cal.App. 632, 635 [274 P. 601]; *People v. Coker,* 78 Cal. App. 151, 160 [248 P. 542]; *People v. Rodway,* 77 Cal.App. 738, 740 [247 P. 532]; 8 Cal.Jur. § 247, p. 166.) Defendant's real contention seems to be that of the insufficiency of the evi-

dence of his identification with respect to the several crimes charged against him.

■ From the evidence it appears that Leary is taller than Crain and is afflicted with continual trembling and twitching of parts of the body, which is due to the chronic disease of chorea. These muscular tremors and twitchings markedly increase in times of excitement. The manner in which the two men dressed, the difference in their height, and Leary's affliction were aids to identification. With respect to the Ocello murder, one witness was able to testify to the nervousness of the driver of the car, his hands shaking at the wheel. Others testified to the comparative sizes of the two men, to the fact that the shorter man did the shooting, and to the manner in which they were clothed. This evidence of identification, coupled with Leary's admissions to the police, was amply sufficient to support the verdict against him on the first and second counts of the information. With reference to the third count, Leary was positively identified by the victim, Rack.

■ With reference to the fourth and fifth counts, the Mathews and Landers robberies, although there was no direct evidence of Leary's connection with these crimes, his admissions to the police coupled with the evidence that he acted as driver of the automobile for the entire series of crimes, sufficiently supports the verdicts against him.

■ It is argued both in defendant's opening brief, and by counsel in his reply brief, that the trial court committed prejudicial error by permitting the introduction in evidence of the two statements of Mrs. Leary. When told by the police of the first, or written statement, Leary replied, as above set forth, "I am going to take it the hard way," and he later nodded his head in the affirmative, in corroboration of Crain's statement that Mrs. Leary first knew they were going to rob the liquor store after they came out and Crain told her "he shot the old guy." Later, when confronted with Mrs. Leary herself, Leary first replied, "All I can say is I don't like it very much," and then stood mute before the further query "Do you deny it?" The subject of the admissibility in evidence of an accusatory statement to which a defendant under arrest has made an equivocal reply is reviewed in *People* v. *Simmons,* this day decided (*ante,* p. 699 [172 P.2d 18]). Assuming that under application of the rule there declared in the similar situation here shown, it may have been error to admit the accusatory statements, it is

clear that the defendant suffered no prejudice in view of his admissions and the other detailed evidence in proof of the crimes, overwhelmingly establishing guilt. No error justifying a reversal of the judgment is shown (Const., art. VI, § 4½).

From the record the district attorney may not justly be charged with prejudicial misconduct in requesting the court to consolidate the murder trial with that on the other charges, nor was there any abuse of discretion on the part of the court in not ordering separate trials of the two defendants. (Pen. Code, § 1098.)

The proof of guilt of the defendant in this orgy of crimes is overwhelming and he suffered no prejudice by anything that occurred at the trial.

The judgment and the order denying a new trial are affirmed.

Gibson, C. J., Edmonds, J., Traynor, J., and Schauer, J., concurred.

SHENK, J.—I concur in the affirmance of the judgment but challenge the assumption that certain accusatory statements were erroneously admitted in evidence.

For the reasons set forth in my concurring opinion in the case of *People* v. *Simmons, ante,* p. 723 [172 P.2d 18], the statements were clearly admissible. There is no showing that upon the occasions when Leary was confronted with the statements he was under any compulsion or that he was pressed for a continuance of his conversation with the police when he chose to terminate it. In view of his admissions and other detailed evidence in proof of the crimes, the matter contained in Mrs. Leary's statements was merely cumulative; the statements were not used as a device to read into the record testimony of matters which could not otherwise be shown.

The fact that the accusations were made by the wife of the accused who was incompetent to testify against him without his consent (Pen. Code, § 1322), did not render the statements inadmissible (*People* v. *McCrea,* 32 Cal. 98, 100; *People* v. *Murphy,* 45 Cal. 137, 143; *People* v. *Ah Yute,* 53 Cal. 613; 8 Cal.Jur. § 196, p. 103; *State* v. *Portee,* 200 N.C. 142 [156 S.E. 783, 80 A.L.R. 1229]; *Richards* v. *State,* 82 Wis. 172 [51 N.W. 652]; *State* v. *Laudise,* 86 N.J.L. 230 [90 A. 1098]; *Joiner* v. *State,* 119 Ga. 315 [46 S.E. 412]; *Nunn* v.

*State,* 143 Ga. 451 [85 S.E. 346]; *State* v. *McNamara,* 116 N.J.L. 497 [184 A. 797, 185 A. 479]; *Thomasson* v. *State,* 21 Ala.App. 562 [110 So. 563]; *Allen* v. *State,* 20 Ala.App. 467 [103 So. 712]; *State* v. *Wooley,* 215 Mo. 620 [115 S.W. 417]; *Rex* v. *Bartlett,* 7 Car. and Pay. 832; *Rex* v. *Smithers,* 5 Car. and Pay. 332; 8 Wigmore on Evidence (3d ed., 1940) § 2232, p. 237; 22 C.J.S. p. 1259; 20 Am.Jur. § 577, p. 487; 2 Wharton's Criminal Evidence (11th ed., 1935) § 658, pp. 1094 et seq.; 80 A.L.R. p. 1246), nor did the fact that Mrs. Leary was under arrest on suspicion of being an accomplice in the commission of the crimes make them inadmissible (*People* v. *Shelest,* 62 Cal.App. 213, 217 [216 P. 389]).

Defendant complains of the instruction given on the subject of the limited purpose of the accusatory statements. The instruction, however, was correct. In the absence of exceptional circumstances, which are not here present, accusatory statements of the character here under attack are admissible against a defendant whether he be tried alone or jointly, provided that in the latter case they are properly limited to the defendant concerned (*People* v. *Yeager,* 194 Cal. 452, 486 [229 P. 40]). The court stated to the jury at least three times that "the testimony of a conversation as to one defendant is admissible only as to the one who made it."

The record shows no error at the trial.

Spence, J., concurred.

Appellant's petition for a rehearing was denied September 12, 1946.