[Crim. No. 1108. Fourth Dist. June 11, 1956.]

THE PEOPLE, Respondent, v. ROBERT E. MEARS, Appellant.

Richard J. Weller, under appointment by the District Court of Appeal, for Appellant.

Edmund G. Brown, Attorney General, and Elizabeth Miller, Deputy Attorney General, for Respondent.

BARNARD, P. J.—The defendant was charged with the murder of William Mayne, and with a prior conviction of manslaughter in Illinois in 1948. He pleaded not guilty and admitted the prior conviction. A jury found him guilty of murder in the second degree, and he has appealed from the judgment and from an order denying his motion for a new trial.

There is no dispute as to the material facts, the appellant's testimony with respect to what occurred being substantially in accord with that of the witnesses. The appellant and

Mayne were employed by a carnival which was showing in Fontana. Mayne was about 5 feet 8 inches tall and weighed 160 pounds, and the appellant is about 6 feet tall and weighs about 190 pounds. During most of the evening of May 10, 1955, the appellant, Mayne and three other employees of the carnival, Karczewski, Dunaway and Kinser, were in a bar in Fontana. During the evening there were two or three slight quarrels between the appellant and Mayne. After one of these Mayne approached the appellant and apologized, but the appellant paid no attention to him. Later, about 11:45 p. m. Mayne again approached the appellant and the appellant said "I told you to get away." Mayne, who was then very intoxicated, walked away and went out of the door. He told Kinser that he was going to go back and go to bed, and Kinser left with him.

About 15 minutes later the appellant, Dunaway and Karczewski also left and went to a nearby pool hall. They then returned to the carnival grounds. On the way, the appellant stated to the other two that Mayne thought he was pretty smart and if he was slapped up a bit he would not be so smart. As they entered one gate of the carnival grounds, about 12:30 a. m., they saw Mayne and Kinser entering at another gate. The appellant took off his jacket and shirt and told Dunaway and Karczewski that he was going to talk to Mayne and have it out with him. As they approached each other the appellant said to Mayne "You think you are a smart son-of-a-bitch." Mayne said: "Bob I never done anything to you." The appellant replied: "I don't think you will be so smart after I am through with you." The appellant hit Mayne twice on the side of the head, and Mayne fell down on his back. The appellant then kicked Mayne a couple of times in the ribs and chest and grabbed him by the belt and shook him. Karczewski and Dunaway told the appellant to quit and the appellant told Mayne to get up. Mayne did so and said "Bob, I am sorry. I have had enough." The appellant said: "Get out of here, I want to see no more of you." Mayne went over to a water fountain and started to rinse his mouth out, and the appellant followed. The appellant said something to Mayne who stood up, and the appellant hit him two blows in the face and he fell to the ground. As Mayne lay on the ground the appellant kicked him two or three times in the upper part of his body. The other men told the appellant to leave him alone, and the appellant told Mayne to get up. Mayne tried to get up,

and while he was in a sitting position the appellant knocked him down and kicked him again around the face. Dunaway told the appellant to leave Mayne alone, Mayne did not stir, and the appellant went to the fountain and threw some water on Mayne's face. He then told Kinser to take care of Mayne, saying: "I have never had a man die on me yet and I don't want this one to." The four men then picked Mayne up and laid him on a platform under a canvas. There was blood coming out of Mayne's mouth, nose and ear, and there were cuts on the right side of his chin and forehead. Dunaway suggested that they get a doctor and the appellant agreed, but no doctor was called. As they were leaving the carnival grounds the appellant told the other men "Remember, whatever happens, you don't know nothing about it. You saw what happened to him, and the same could happen to you."

The four men then went to a couple of other bars and a drive-in, and later went in search of some whiskey after the bars had closed. About 3 a. m. they returned to the carnival grounds, and the appellant said to the others: "Remember, we will get our story together, we found this man where he was." They found Mayne still breathing and with a pulse, but he did not appear to have moved. The other men told the appellant to call a doctor, and the appellant waited to change his trousers. The four men then went to a nearby police station where the appellant and Karczewski told the man on duty that they wanted an ambulance as there was a man in the park who was beaten up.

Two officers returned to the carnival with the four men. Mayne was lying in the same place with a large amount of blood on and around the head, with a 6-inch pool of blood under his head. He appeared to have a very slight pulse and there was a large gash on his chin. An officer radioed for an ambulance and Mayne was taken to a hospital. Shortly thereafter, the officer received a radio message saying that Mayne had been pronounced dead on arrival at the hospital, and told this to the appellant. Shortly thereafter the appellant took his blood-stained pants, which he had previously removed, and climbing over a fence placed the pants in a nearby brush pile, where they were later found.

An autopsy on the body of Mayne was performed about 9 a. m. on May 11. The autopsy surgeon testified that his examination of the body showed that it had been a young man in good physical condition except for injuries. There were two lacerations in the scalp on the left side of the head,

each extending about an inch and a half. There was a similar laceration on the chin, and a slight abrasion on the right cheek. The face was swollen and bruised all over, particularly on the right side. There were bruises on the right collar bone and in the front of the abdomen. The nose was badly bruised and broken. The doctor testified that the lacerations on the scalp and chin had rough edges, indicating that they were made with a blunt instrument and not by a fist; that they were similar to injuries which he had previously seen which had been caused by a kick with a boot or heavy shoe; that some of the other bruises could have been caused by a clenched fist; and that he did not think the injuries themselves would have caused death except for the blood fluid in the lungs, which stopped respiration. He expressed the opinion that the cause of death was shock and asphyxia, the latter meaning that due to hemorrhage resulting from these injuries the air could not get into the lungs.

The appellant's first contention is that the evidence is not sufficient to support the verdict. It is argued that the evidence would not support an inference that the defendant intended to take the life of the deceased; that an implication of malice is not warranted since the blows causing the death were inflicted with the fist and there are no aggravating circumstances, and since such lacerations as here appear are common to all fistic encounters; and that since the injuries suffered by the deceased could not be considered great bodily injuries nothing more than manslaughter here appears.

The malice involved in murder is defined in section 188 of the Penal Code, and may be express or implied: ''It is implied, when no considerable provocation appears, or when the circumstances attending the killing show an abandoned and malignant heart.'' ▮ While there was no evidence here of a deliberate intention to take the life of Mayne the evidence does show that there was no considerable provocation, and was sufficient to justify an inference that the appellant acted with an abandoned and malignant heart. It clearly appears that the appellant was the aggressor and that he repeatedly committed a brutal and unprovoked assault upon Mayne at a time when Mayne was obviously in no condition to defend himself, and when he was trying to avoid any encounter with the appellant. The attack did not consist of mere blows from a fist, but on each of three occasions after Mayne had been knocked to the ground the appellant kicked him in a vicious manner, which he must have known would

inflict great bodily injury with probable danger to life, especially where the victim was left in an unconscious condition and uncared for for several hours. It may be inferred from the evidence that Mayne died from shock from the wounds thus inflicted, along with the asphyxia which resulted from the attack. The result is the same whether or not, as appellant argues, more experienced help while Mayne was being transported to the hospital might have saved his life. The evidence sufficiently supports the verdict. (*People* v. *Tubby,* 34 Cal.2d 72 [207 P.2d 51] ; *People* v. *Cayer,* 102 Cal. App.2d 643 [228 P.2d 70] ; *People* v. *Burns,* 109 Cal.App.2d 524 [241 P.2d 308, 242 P.2d 9].)

It is next contended that the court erred in overruling an objection when the appellant was asked if it was not a fact that he had, in 1948 in Illinois, knocked a man down in a fist fight and left him unattended, and that the man died. The appellant replied in the affirmative to this question. It is argued that this involved the prior conviction which was admitted, but that the details comprising the prior offense were not admissible and must have had a prejudicial effect on the jury. This evidence was material on the issue as to whether malice was involved, and tended to show knowledge on the part of the appellant that in committing these assaults in this manner he was endangering Mayne's life. In the closing brief it is argued that this evidence was unnecessary since prior thereto the appellant had testified that he knew that a man beaten by him and left unattended might die. In his previous testimony, the appellant had made a qualified answer to the question asked which left the matter somewhat in doubt. While it may be conceded that this question would better have been omitted, no prejudicial error appears. (*People* v. *Lancey,* 141 Cal.App.2d 168 [296 P.2d 53].)

It is next contended that the court erred in giving an instruction concerning evidence of a prior offense, and the limited purpose for which it was received. It is argued that this instruction incorrectly assumed that such evidence had been received. This contention is based upon the appellant's interpretation of a part only of his testimony, and is without merit.

It is next contended that the court erred in giving the following instruction:

"A homicide may be murder, even where the specific intent to take life does not appear or does not exist. Thus, where the killing is involuntary, but happens in the inten-

tional commission of an unlawful act, which, in its consequences, naturally tends to destroy life, it is murder; so, if the intent to kill is not made apparent, but the killing is unlawful and not done in the heat of passion, or the specific intent to take life not appearing, all the circumstances show an abandoned and malignant heart. In these, and in like cases, the malice aforethought is implied, and the law attributing to the slayer the intent to kill, although such intent is not made manifest as a fact.''

It is argued that this instruction improperly told the jury that the intentional commission of an unlawful act which naturally tends to destroy life is murder, whether that unlawful act is a felony or a misdemeanor; that it fails to completely distinguish murder from manslaughter; and that it is incomplete in that it seems to say that implied malice is the only necessary ingredient of murder notwithstanding the fact that the killing is not unlawful . The implied malice as described in section 188 of the Penal Code requires no specific intent to kill, and the distinguishing characteristic between murder and manslaughter is malice rather than the presence or absence of an intent to kill. While it is true that an assault ''by any means of force likely to produce great bodily injury'' may be punished either as a felony or as a misdemeanor (Pen. Code, § 245), this phase of the matter was amply covered in other instructions given. Instructions must be construed as a whole and it would be impractical to include all of the various elements here involved in one instruction. The jury was here instructed that the thing that distinguishes manslaughter from murder is that the killing be done without malice, and that manslaughter is distinguishable from murder in that though in manslaughter the act which occasions the death be unlawful or likely to be attended by bodily mischief yet the malice, either express or implied, which is an essential element of murder is wanting. In the other instructions given the court defined malice and malice aforethought in the usual way, and fully instructed the jury on all elements of both murder and manslaughter. In this connection the appellant also complains of the following instruction: ''The presence or absence in a homicide of an intent to kill is not the determining factor in drawing the distinction between murder and manslaughter, for murder may be committed where there is no intent to kill.'' This instruction was a correct statement of the law. (*People* v. *Bender*, 27 Cal.2d 164 [163 P.2d 8];

*People* v. *Valentine*, 28 Cal.2d 121 [169 P.2d 1].) Assuming that there was some evidence which would have justified the jury in finding the appellant guilty of manslaughter the instructions, as a whole, sufficiently left that question to the jury, and it cannot reasonably be held that the jury was misled in that connection. No prejudicial error appears.

 It is next contended that the court erred by stating, in an instruction concerning extrajudicial statements and declarations of the appellant, that evidence had been received tending to show that on another occasion the appellant had made a statement tending to prove his guilt of the crime for which he was being tried. This instruction covered the difference between a confession and an admission against interest, and told the jury how each should be considered by it. The argument here made is that the instruction improperly assumed that there had been evidence of such a statement by the appellant, and that there was no evidence received justifying such an assumption. There was evidence that about 2:15 on the morning of May 11, the appellant told a bartender that he, the appellant, had struck a man and had gotten blood on his pants. On the afternoon of May 11, the appellant asked an officer as to the different degrees of murder and manslaughter and the penalty for them. The officer replied that he did not know. The appellant then told the officer that he would "cop to manslaughter before he would take a murder rap." These two instances were sufficient to justify the court in giving the instruction complained of. (*People* v. *Hinshaw*, 194 Cal. 1 [227 P. 156]; *People* v. *Cooper*, 81 Cal.App.2d 110 [183 P.2d 67].) Under the instructions given, whether the statements made by the appellant constituted an admission was properly left to the jury.

 It is next contended that the court erred in giving the following instruction:

"No words of abuse, insult or reproach addressed to a person or uttered concerning him, however grievous or opprobrious the words may be, will justify him in an assault by means of force likely to produce great bodily injury, and the provocation only of such words will not constitute a defense to a charge of having committed such an assault."

It is argued that this instruction should be read in connection with a later instruction as to the distinction between murder and manslaughter and the amount of provocation

required to reduce the offense from murder to voluntary manslaughter, in which it was stated that provocation of a slight and trifling character which would not naturally arouse the other's passion would not be sufficient to mitigate the offense to manslaughter. Relying on *People* v. *Valentine,* 28 Cal. 2d 121 [169 P.2d 1], it is argued that the two instructions, taken together, improperly told the jury that words alone could not serve as the provocation which would reduce a killing from murder to manslaughter; and that this instruction was an unwarranted invasion of the province of the jury. The instruction complained of was not given in connection with any instruction on the reduction of murder to manslaughter, but was given in another and different connection relating to the justification for assault by means of force likely to produce great bodily injury. The instruction was proper in the connection in which it was given, and it is unthinkable that the jury could have been misled into giving it the interpretation which the appellant now ascribes to it.

The appellant's final contention, that the court erred in denying his motion for a new trial, is based upon the points already considered and is without merit. The issue as between murder and manslaughter was left to the jury, under sufficient instructions, and the record does not indicate that any miscarriage of justice has occurred.

The judgment and order are affirmed.

Griffin, J., and Mussell, J., concurred.