[Crim. No. 6361.    Second Dist., Div. Two.    Oct. 7, 1959.]

THE PEOPLE, Respondent, v. LEO LEWIE, Appellant.

Gladys Towles Root for Appellant.

Stanley Mosk, Attorney General, William E. James, Assistant Attorney General, and Philip C. Griffin, Deputy Attorney General, for Respondent.

FOX, P. J.—Defendant was convicted of murdering his wife, Blanche, and his stepdaughter, Minda. The jury fixed the offense as murder in the second degree in each instance.[1]

---

[1]In a later jury trial defendant was found to have been ''sane'' at the time of the commission of these offenses.

Defendant's motion for a new trial was denied and he was sentenced to the state prison. He has appealed from the order denying his motion for a new trial and from the judgment of conviction.

In seeking a reversal defendant contends: (1) that the evidence is insufficient to support the conviction of second degree murder; and (2) that the trial court erred in limiting the defense of "state of mind." In view of defendant's first contention, it is necessary to set forth the evidence in considerable detail, and, under established principles of appellate procedure, to view the evidence in the light most favorable to the People. (*People* v. *Caritativo,* 46 Cal.2d 68, 70 [292 P.2d 513]; *People* v. *Patterson,* 169 Cal.App.2d 179 [337 P.2d 163].)

Defendant was born in Poland and engaged in the restaurant business in Jerusalem. In 1953 he left Jerusalem with some cash, jewelry and diamonds and came to New York on a business visa and then to Los Angeles. In October of that year he met and married Blanche. Each had been married previously and each had two minor children who lived with them in their newly established home. One of Mrs. Lewie's children was named Minda. She was born in November, 1941.

Desiring to remain in this country, defendant retained Murray Chotiner, Esq., to assist him in this respect and to represent him in connection with his application for citizenship.

Defendant engaged in various business ventures. At the time of the incidents here involved he was a partner with Herman Sinagub in a liquor store in Los Angeles.

On the evening of May 5, 1957, defendant and his wife had a severe quarrel that resulted in defendant's using physical violence on his wife. Minda, then 15½ years old, became frightened, ran out of the house and called the police. Upon the arrival of the police, the officers observed that defendant had scratches on his arms which, he explained, his wife had made. They also observed that Mrs. Lewie had a swollen nose and lips, with blood across the bridge of her nose. There was discoloration in the corner of one of her eyes and above the bridge of her nose which appeared to be broken. Defendant's story was that during their argument his wife had sat down in his lap, pulled off her shoes and struck him in the forehead with the heel; that he got up and she fell to the floor but that he did not strike her. Blanche told the police that defendant had struck her, knocked her

to the floor and then kicked her while she was down; that he had struck her in the face with his fist which caused her nose to bleed; that he had struck her on previous occasions and that she was afraid of him.

The officers searched defendant for weapons. In his right front pants pocket they found a sock containing bullets, and in a rear pocket a large knife. Finding no gun on defendant's person the officers proceeded outside to search his car. Minda told them that defendant was an alien and that he carried a gun. She accompanied them to the car. Under the front seat they found an automatic with a shell in the chamber. Defendant admitted that he was an alien but explained that he needed the gun for protection when he carried large sums of money from the liquor store in which he was a partner. At that time Minda told the officers that they must take defendant to jail for otherwise he would kill her and her mother; that he had killed many people before while in the Underground in Poland and thought nothing of killing people. Defendant, however, stated that he would not harm them; that if the officers left him there "everything would be worked out all right." Blanche stated she had hidden a snap blade knife that defendant owned because she was afraid he would kill her with it; that he had threatened her on prior occasions with it. She produced the knife from a hat box in her closet and gave it to the officers. Defendant was thereupon arrested on a charge of wife beating. (Pen. Code, § 273d.) As defendant walked out of the house with the officers he turned to Minda and said "You will be sorry." That night one of the officers returned to the Lewie residence in a private capacity and acted as a guard pursuant to Blanche's request for which he was paid.

While defendant was in jail the district attorney filed a complaint charging him with violating Penal Code, section 12021, relating to the possession of firearms by an alien.

On May 8th, as a result of charges made by Minda, a criminal complaint was filed against defendant containing two counts of child molesting (Pen. Code, § 288) and two counts of statutory rape (Pen. Code, § 261, subd. 1.)[2]

Following a preliminary hearing on May 14th defendant was held to answer on all charges. He was released on bail

[2]Prior to any complaint to law enforcement officers Minda's mother had her examined by a doctor specializing in obstetrics and gynecology, who formed the opinion that there had been a penetration of Minda's vaginal cavity, and that it was a non-virginal opening.

at that time. Upon his arraignment on June 3d defendant pleaded "not guilty." Trial was set for July 22d.

On May 10th Blanche, through Chotiner, filed suit against defendant for divorce. The property was tied up by a restraining order.

While defendant was in jail Blanche left the family home, taking Minda and her son, Martin, with her. She first moved to Laguna Beach, where she put the children in school for about 15 days. Upon removing them from school she told them and the hotel proprietor where they lived that defendant might find them by tracing the school transfer records and that if he ever caught up with them he would probably kill them all. From Laguna Beach they moved to Ventura, then to Carpinteria and on July 17th, to Santa Monica, where Blanche registered at a motel under the name of Miriam Rogers.

When defendant was released from jail he went to the family home but found no one there. He began making inquiries about his wife. He asked his partner several times where she could be found. His comments frightened Mr. Sinagub. Defendant visited Minda's orthodontist to inquire whether Minda had an appointment. When Minda later came to the office and was informed that defendant had been asking about her she became very frightened and turned white.

Defendant made inquiry of one of his employees at the liquor store about obtaining a gun, saying that he wanted to scare his wife.

Sometime after the divorce suit was filed defendant met Chotiner in a parking lot in Beverly Hills. Defendant told him he "would like to talk to Blanche." Chotiner replied that it was perfectly all right as far as he was concerned but that his wife was afraid of him; that she had told him that defendant would kill her and Minda and that she would not meet with him unless there was an officer or someone else present. On the morning of July 17th defendant went to Chotiner's office in Beverly Hills and inquired whether Chotiner was there. Defendant was advised that Chotiner was not in and was asked whether he desired to leave a message. He said "No" and left. The next morning Mrs. Lewie and Minda came to Chotiner's office and had a conference with him. Early that afternoon Chotiner received a telephone call from a Mr. Wallace, one of the attorneys representing defendant in the divorce action, inquiring whether Mrs. Lewie would consent to dropping the morals

charges against defendant. Chotiner advised him that she would not so consent. Mrs. Lewie and Minda returned to Chotiner's office at approximately 3 p. m. He drove them to Inglewood, returning with them to the office at about 4:15 p. m. Chotiner left the office in a few minutes. Mrs. Lewie and Minda remained there.

At approximately 4:30 defendant entered the reception room of the Chotiner office where Minda was talking to Mrs. Tannes, Chotiner's secretary, about becoming a secretary. Upon seeing defendant, Minda ran screaming into the library where her mother was telephoning. Mrs. Lewie stepped out of the library, placing herself between defendant and Minda, who was standing in the library doorway. As Mrs. Lewie approached defendant he said, "I want to talk to you." She replied, "I don't want to talk to you," and began to try to push him out of the room. Minda, however, suggested that they have a talk. Mrs. Lewie asked the secretary, Mrs. Tannes, to call the police. Mrs. Tannes picked up the telephone. Defendant looked at her and said, "Don't do it," whereupon she dropped the receiver. As defendant made this remark "he reached to his waistline and it looked as if he was unbuttoning his coat." Mrs. Tannes remarked, "Leave me out of this." As she stood up she noticed that Mrs. Lewie had a pair of scissors, that she (Mrs. Tannes) had left on her desk, in her hand pointed at the defendant, but Mrs. Lewie did not make any motion or thrust with the scissors. At that point Mrs. Tannes, fearing something was going to happen, knelt behind her desk. According to defendant's statement to one of the officers, he took the scissors away from his wife and put them down. As Mrs. Tannes peeked over the top of her desk she saw Mrs. Lewie standing with her hands at her side facing defendant. No scissors were visible. Defendant, according to the testimony of Mrs. Tannes, unbuttoned his shirt at the waistline and pulled out a gun. "He put it to Mrs. Lewie's stomach and after looking at each other for a brief second he fired the shot." Mrs. Tannes "could see the blood coming to the back of her dress, and she fell." As she fell, defendant stepped over her and went to Minda, who was lying on the floor near the library door. He bent over her and appeared to be trying to fire the gun but was having trouble with it. It seemed to be jammed. While defendant was crouched over Minda, Mrs. Tannes ran out and down the stairs to another law office where she related to the secretaries there what had happened. One of the attorneys, when he

heard the excited voices, came out of his office, listened a moment to Mrs. Tannes, then opened the door to the stairwell and started out. He immediately heard two gun shots about two seconds apart, after which he ran down the stairs to the main floor. He observed a man about the size of defendant run from the building, cross the street and get into a car and leave.

Officer Moe, of the Beverly Hills Police Department, arrived at the scene at approximately 4:55 p. m. The bodies were still on the floor. Directly under the place where Mrs. Lewie was lying there was blood and a hole in the rug which by pencil insertion appeared to be at a 45 degree angle. An expended projectile was found under the rug. The floor was cement. Directly under the body of Minda there were two spots of blood and a hole in the rug straight down in the area under her head. Under the rug was found a fragmented, expended, lead projectile. Two other expended projectiles were found in the offices. Officer Moe found some unfired cartridges as well as some empty shells on the floor. The scissors were found on the desk.

At approximately 8:15 on the night of the shooting Officers Graftenreed and Ingram observed defendant in a telephone booth. Graftenreed opened the door and asked: ''Are you Lewie?'' Defendant replied, ''I am the man you are looking for.'' The officer then asked him, ''Where is the gun?'' Defendant said, ''It is inside my shirt and waistband.'' The officer removed the gun, which contained eight shells. Defendant immediately asked, ''Are they both dead?'' En route to the police station, Officer Ingram asked defendant why he had shot the little girl. Defendant replied that she was as bad as her mother; that there was a case pending in court against him for molesting the little girl; that the charges were untrue; and that they were both liars. At the police station defendant stated that he bought the gun from a colored truck driver some two weeks previously with the intention of killing himself. Officer Graftenreed asked him, ''If you were going to kill yourself with the gun why did you take the gun to Mr. Chotiner's office with you?'' In reply defendant stated: ''I hadn't decided yet whether to kill myself or to kill my wife, and when I got to the office I killed them both.'' He added, ''I went there with the intention of settling everything, and I guess I settled it once and for all.'' He then related that he and his wife got into an argument in Chotiner's office about their affairs; that she picked up a pair of scissors

and came at him; that he took the scissors away from her; that he got mad and shot her; and then turned the gun on the little girl and shot her. Later defendant stated to Officer Valentine that "They [his wife and Minda] tried to destroy me . . ."

Before the verdict of a jury which has been approved by the trial court can be set aside on the ground of the insufficiency of the evidence it must be made clearly to appear that upon no hypothesis whatsoever is there substantial evidence to support the conclusion reached in the court below.

We must assume in support of the judgment the existence of every fact which the jury could reasonably deduce from the evidence. (*People* v. *Newland,* 15 Cal.2d 678, 681 [104 P.2d 778]; *People* v. *Ogg,* 159 Cal.App.2d 38, 48 [323 P.2d 117].)

"Murder is the unlawful killing of a human being, with malice aforethought." (Pen. Code, § 187.) Thus "malice aforethought" is an essential element of the crime of murder whether of the first or second degree. (*People* v. *Bender,* 27 Cal.2d 164, 180 [163 P.2d 8].) "Such malice may be express or implied. It is express when there is manifested a deliberate intention unlawfully to take away the life of a fellow creature. It is implied, when no considerable provocation appears, or when the circumstances attending the killing show an abandoned and malignant heart." (Pen. Code, § 188.) Murder and the degrees thereof are defined in section 189 of the Penal Code as follows: "All murder which is perpetrated by means of poison, or lying in wait, torture, or by any other kind of wilful, deliberate, and premeditated killing, or which is committed in the perpetration or attempt to perpetrate arson, rape, robbery, burglary, mayhem, or any act punishable under Section 288, is murder of the first degree; and all other kinds of murder are of the second degree."

"Manslaughter is the unlawful killing of a human being without malice." (Pen. Code, § 192.) Thus the distinguishing element between murder and manslaughter is the presence or absence of malice. (*People* v. *Mears,* 142 Cal. App.2d 198, 204 [298 P.2d 40]; *People* v. *Ogg, supra,* p. 50.)

Applying these principles to the facts herein delineated it is apparent that there is ample evidentiary support of the verdict of murder in the second degree. Defendant admitted shooting both of the victims. The killing in each instance was obviously unlawful. From defendant's statements and acts the jury could properly find that he "manifested a deliberate intention unlawfully to take away the life"

of his wife and Minda. Thus malice was established (Pen. Code, § 188). Hence all the elements of second degree murder are present.

But, argues defendant, if he ''is guilty of killing the victims with 'malice aforethought,' then the killing was wilful, deliberate and premeditated—first degree murder, and if he is not guilty of killing with 'malice aforethought,' he is guilty of manslaughter only . . .'' The fallacy of this argument is pointed out by the court in *People v. Bender, supra*. After stating that malice aforethought is an essential element of murder of the second as well as of the first degree, the court further stated that ''such malice aforethought is not synonymous with the elements of deliberation and premeditation which must accompany a homicide to characterize it as murder of the first degree.'' (P. 180.) In the instant case the jury could properly find from the evidence that defendant committed the homicides with malice aforethought but there was lacking that deliberation and premeditation to make the killings murder in the first degree, hence the verdict of second degree murder.

Defendant argues that ''the legislature has not defined the essential elements or acts constituting the crime of murder second degree . . .'' A mere reading of the sections of the Penal Code quoted herein is an adequate answer to this argument. See also discussion of these code sections and the various aspects of homicide in *People v. Bender, supra*, pages 180-186.

Defendant argues that the trial court erred in sustaining the prosecution's objections to the proffered testimony of Rabbi Bergman. The offer of proof related to an interview between the rabbi and defendant some two months before the murders, at which defendant related to the rabbi the events involving his trouble with his wife. The rabbi was to have testified concerning statements made by defendant and to his appearance at that time. The prosecution objected that this testimony was hearsay, incompetent, irrelevant, immaterial and without proper foundation. The following was the offer of proof: ''That the defendant went to the Rabbi for consultation, telling him that he had been falsely charged in a morals charge with a morals offense, and that he was having domestic difficulties.

''That they had jailed him. That when he was released from jail he found himself without any money or access to any of his money.

"That he thought that he had an attorney by the name of Mr. Murray Chotiner and when he called him to the jail, Mr. Chotiner then informed him that he was representing the wife.

"That he gave a check to an attorney for services and found that he could not have the services of that attorney and that the check, there had been a hold on it—a hold was placed on the check by Mrs. Lewie and her then attorney, who had been his past attorney, to wit, Mr. Murray Chotiner.

"That he was distraught and without funds with which to live or to obtain any sort of legal or medical advice. That he was without his business. That he was without a job. That he was sick and penniless.

"That his appearance was such that he acted as a man in a shock, in a daze, and completely not coordinated in thought or action."

The question presented is this: Did the trial court exclude competent evidence tending to show that defendant committed the homicides absent the essential mental state of malice aforethought? The statements made by defendant during the interview with the rabbi were not admissible in his favor since they were self-serving and hearsay. There was clearly no error in the court's ruling on this aspect of the offer of proof.

As to the rabbi's impression that defendant appeared to be in a shock or daze and not coordinated in thought or action, the objection went to the point that he had only seen defendant on one occasion some two months before the shooting. The trial judge may well have felt that this opinion was too remote to be relevant. The ruling does not appear to be an abuse of discretion.

Assuming such evidence was admissible its exclusion was not prejudicial since it was merely cumulative to other evidence introduced by defendant on this subject. (*People* v. *Valencia,* 30 Cal.App.2d 126, 129 [86 P.2d 122]; *People* v. *Goldberg,* 110 Cal.App.2d 17, 27 [242 P.2d 116]; *People* v. *Thompson,* 134 Cal.App.2d 423, 429 [285 P.2d 958].) Throughout the record defense witnesses and the defendant himself testified that he was suffering from great emotional stress and strain and appeared to be distraught, greatly worried over possible deportation and the morals charges that had been filed against him, downhearted, depressed and nervous, and had threatened suicide. In light of this evidence it is readily apparent that the testimony of the rabbi would have been merely cumulative.

Examination of the record does not indicate that it is

reasonably probable that a result more favorable to defendant would have been reached had the particular evidence in question been received. There was no miscarriage of justice in this case. (*People* v. *Watson,* 46 Cal.2d 818 [299 P.2d 243].)

The judgment and order are affirmed.

Ashburn, J., and Herndon, J., concurred.