[Civ. No. 20258. First Dist., Div. One. Jan. 31, 1962.]

JOSEPH URETA, Petitioner, v. THE SUPERIOR COURT OF MONTEREY COUNTY et al., Respondents.

Henry B. Fulton and Noland, Hamerly, Etienne & Fulton for Petitioner.

Stanley Mosk, Attorney General, Albert W. Harris, Jr., and Edward P. O'Brien, Deputy Attorneys General, for Respondents.

BRAY, P. J.—Petition for writ of prohibition to restrain the Superior Court of Monterey County from proceeding further in the prosecution of a charge of violation of section 187, Penal Code (murder).

QUESTION PRESENTED

Is the corpus delicti proved by showing merely that the death was caused by morphine poisoning?

RECORD

Petitioner was charged with the crime of murder. After being held to answer at the preliminary examination, petitioner moved the superior court, under section 995, to set aside the information. On the denial of his motion petitioner filed his petition herein.

Disregarding, as we must, in determining whether there was probable cause shown that the death was caused by the criminal agency of another, the admissions of petitioner (*People* v. *Cullen* (1951) 37 Cal.2d 614, 624 [234 P.2d 1]), the sole evidence in the case is as follows:

Around midnight on June 6, 1961, one Joseph Cota was

found dead in room 3 of a certain Salinas apartment house by a policeman admitted to the room by petitioner, who unlocked the door. This room had been rented by petitioner on March 31 and occupied by him ever since. The room contained one bed, a dresser, and several chairs. It had only one entrance from the hallway. Deceased was lying on the floor on the opposite side of the bed. In a bureau drawer was a capsule containing white powder.[1]

Dr. Crellin, who performed an autopsy on Cota's body, testified that the cause of death was pulmonary edema and congestion resulting from morphine poisoning. He found a recent puncture wound on deceased's right arm inside the elbow. There was no other evidence produced except the testimony as to petitioner's acts and extrajudicial statements.

This testimony shows that petitioner entered the police department and reported that there was a dead man in his room. Petitioner accompanied officers to his room which he unlocked for them. He then stated to them that deceased had been sleeping on the floor and had died at that particular location. Petitioner stated that he had found the capsule on the floor alongside deceased and had put it in the drawer. Later petitioner stated that he first met deceased in Chinatown, where deceased was looking for narcotics. Eventually he and deceased purchased four small tablets containing a quarter grain of morphine. Petitioner then shot three of these into deceased's arm and one into his own. Later in the day they purchased two more tablets of a narcotic which petitioner thought was morphine. They then borrowed a hypodermic needle and after cooking the stuff each shot himself in the arm. After dozing for a while petitioner noticed that deceased was getting cold. He then laid him on the floor and applied wet towels to his face in an effort to bring him around. At that time he noticed blood beginning to ooze from deceased's nose. Petitioner then lay down on the bed. Eventually feeling that deceased was dead, he left the room, placing a "Do Not Disturb" sign on the door to prevent the landlord from coming in as he did not want deceased to be discovered. He then went out on the streets to try to borrow money so that he could leave town. He also tried to find someone to help in removing the body. Several persons advised him to go to the police, and eventually he reported the incident.

There is no contention that if petitioner's acts and admis-

---

[1] This powder was examined later for narcotics but the result was not produced.

sions were admissible, sufficient probable cause was not shown to justify holding petitioner to answer.

## The Corpus Delicti

In a murder case the corpus delicti consists of two elements: the death of the alleged victim, and the existence of some criminal agency as the cause. Either or both of these elements may be proved circumstantially. (*People* v. *Cullen, supra,* 37 Cal.2d 614, 624.) It is not necessary that it connect the defendant with the commission of the crime. (*People* v. *Leary* (1946) 28 Cal.2d 740, 745 [172 P.2d 41].) The prosecution is not required to establish the corpus delicti by proof as clear and convincing as is necessary to establish the fact of guilt; rather slight or prima facie proof by circumstantial evidence is sufficient at least for admission of extrajudicial statements. (*People* v. *Corrales* (1949) 34 Cal.2d 426, 429 [210 P.2d 843].)

The evidence here, disregarding the extrajudicial acts and statements of petitioner, shows that deceased was found dead in petitioner's room, with a puncture wound on the inside of his right arm below the elbow. The death was caused by morphine poisoning.

Does this raise a reasonable inference that the death may have been caused by criminal agency? To determine this question it is necessary to point out that the *furnishing,* selling or *administering* of narcotics to another is a felony. (Health & Saf. Code, § 11501; Pen. Code, § 17; see *People* v. *Graff* (1956) 144 Cal.App.2d 199, 206 [300 P.2d 837].) "Death resulting from the commission of a felony such as furnishing, selling or administering of narcotics . . . constitutes murder of the second degree." (*People* v. *Poindexter* (1958) 51 Cal.2d 142, 149 [330 P.2d 763].) The most reasonable inference is, not that deceased manufactured the narcotic which killed him himself, but that he procured it from another. Petitioner contends that assuming such inference, the most reasonable inference is that the furnishing or administering of the narcotic by another was legally done, such as by a physician under circumstances making it legal for a physician so to do. However, *possession* of a narcotic alone establishes a prima facie case of illegal possession under Health and Safety Code section 11500; *People* v. *Rodriguez* (1955) 133 Cal.App.2d 49, 52 [283 P.2d 330] ; *People* v. *Cucco* (1948) 85 Cal.App.2d 448, 453 [193 P.2d 86] ; *People* v. *Wallace* (1952) 109 Cal.App.2d 676, 679 [241 P.2d 264]. Legal pos-

session under the statute is a matter of defense. (*People* v. *Martinez* (1953) 117 Cal.App.2d 701, 708 [256 P.2d 1028].)

It is a reasonable inference that the narcotic was also furnished or administered to him illegally. (See *People* v. *Roberts* (1953) 40 Cal.2d 483, 487 [254 P.2d 501].) It makes no difference whether deceased or another actually injected the narcotic. The person who furnished him the narcotic is liable even though deceased did the actual administering of it.

Petitioner contends that to establish the corpus delicti of murder there must be evidence that the death be shown to have been caused by the criminal agency of a person with malice aforethought. Petitioner cites no cases to support this contention. ▆▆ While conviction of the crime of murder either in the first or second degree requires malice aforethought (Pen. Code, § 187; *People* v. *Lewie* (1959) 174 Cal.App.2d 281, 288 [344 P.2d 861]), logically it is not required for proof of the corpus delicti, as malice aforethought as required by section 187 and defined in section 188 clearly relates to the state of mind of the person committing it. As the establishment of the corpus delicti does not require proof of the identity of the perpetrator of the crime (*People* v. *Leary, supra,* 28 Cal.2d 740), it necessarily follows that malice aforethought, which relates to the mind of the perpetrator, cannot be an essential element of the corpus delicti. (See *People* v. *Cullen, supra,* 37 Cal.2d 614, 624, holding that motive does not form any part of the corpus delicti.) Thus, to prove the corpus delicti, it is only necessary to show by prima facie evidence that death was caused by a criminal agency. Here the most reasonable inferences from the circumstances show that. "To prove a prima facie case of the corpus delicti here, all that was necessary was to show a reasonable probability that the deceased . . . met his death by means of the unlawful act of another." (*People* v. *Mehaffey* (1948) 32 Cal.2d 535, 547 [197 P.2d 12].)

Petitioner's citations are distinguishable. *People* v. *Schuber* (1945) 71 Cal.App.2d 773 [163 P.2d 498], dealt with a charge under section 288, Penal Code. The child had a lacerated vagina but was not asked what caused the injury, nor did the child testify that any person had touched her. The court held that the mere fact of a ruptured vagina did not raise an inference of any injury by criminal agency.

In *In re Flodstrom* (1954) 134 Cal.App.2d 871 [277 P.2d 101], the only evidence, outside testimony of the admissions of the defendant, was that on going to the defendant's home a detective found the deceased baby lying on his back in his

crib; that there were no indications or signs of violence on the child; that he did not see any portion of the pajama in the child's mouth. (Defendant stated that she found the pajama sleeve crammed in the baby's mouth.) One sleeve was damp and had two small blood spots on it. No medical testimony was given as to the cause of the child's death. Obviously, there is no resemblance between the facts of that case and those in the case at bar.

*Hall* v. *Superior Court* (1953) 120 Cal.App.2d 844 [262 P.2d 351], likewise dealt with circumstances dissimilar to those in this case. In that case the autopsy surgeon testified that death was due to a ruptured liver which in his opinion was caused by a blow of some sort, although he said his conclusion was " '. . . just speculation. There was no evidence of any bruises. . . .' " (P. 848.) In addition the evidence showed "that decedent came to the cabin at 7:30 p.m. in a very drunken condition; that he made no complaint and had no bruises upon him; that he asked for food and then went to his room where he was found dead at 6 o'clock the next morning." (P. 850.) Obviously in that case "there is no evidence, direct or circumstantial, from which it can reasonably be inferred that the death of decedent was caused by criminal means . . ." (P. 850.) The court held (p. 849): "The opinion of the autopsy surgeon that the rupturing of the decedent's liver was caused by a blow was not of sufficient substantiality to warrant the conclusion that any such blow was inflicted unlawfully."

Petitioner cites cases where evidence of the criminal agency was stronger than in our case, and reasons from that fact that there was not sufficient evidence here to show death by criminal agency. Such contention is a non sequitur. Petitioner cites *People* v. *Ives* (1941) 17 Cal.2d 459 [110 P.2d 408], which actually supports the prosecution's position here. There the body of the deceased was recovered from the river, clad in bathing trunks. No mark was on the body except a scratch on the head. The autopsy surgeon testified that deceased died " '. . . by asphyxiation, by drowning' " (p. 463); that because of the condition of his lungs and heart, and a chemical analysis of the contents of his stomach which showed traces of chloral hydrate, deceased was probably either partially or totally unconscious when his body entered the water. The court then stated that presumably deceased's condition on entering the water was due to the chloral hydrate. "Assuming that Sherrard [the deceased desiring to commit suicide] could

have swallowed chloral hydrate voluntarily and then entered the water, it is more reasonable to conclude that the drug was administered by another for an unlawful purpose.'' (P. 464.) The court stated that it was a well-known fact that chloral hydrate is generally administered by a physician but that it was not a reasonable inference to infer that a physician would administer it at a time when deceased was so situated that he could not immediately sleep, so that the most reasonable inference that could be drawn from the circumstances was that it was given by a person for the purpose of taking advantage of the person to whom it was administered. The court then said (p. 464) : ''To prove a *prima facie* case of *corpus delicti,* all that was required was to show a reasonable probability that a criminal act of another had been the direct cause of the death of Sherrard.''

The alternative writ is discharged and the petition for a peremptory writ is denied.

Tobriner, J., and Sullivan, J., concurred.

Petitioner's application for a hearing by the Supreme Court was denied March 28, 1962.