THE PEOPLE OF PUERTO RICO, Plaintiff and Appellee, *v.* ÁNGEL LUIS ALETRIZ ROMERO, Defendant and Appellant.

No. 16525. Decided June 12, 1962.

622

*Joaquín Lago Padín* for appellant. *J. B. Fernández Badillo, Solicitor General,* and *Héctor R. Orlandi Gómez, Assistant Solicitor General,* for The People.

Division composed of Mr. Justice Pérez Pimentel, as Chief Judge of Division, Mr. Justice Santana Becerra, and Mr. Justice Rigau.

MR. JUSTICE PÉREZ PIMENTEL delivered the opinion of the Court.

The appellant was found guilty by a jury of murder in the first degree consisting in that on December 7, 1957, with

malice aforethought and deliberation, he unlawfully killed Alcides Rodríguez Villanueva, known as Alcides Villanueva.

In this appeal[1] he assigns the commission of three errors. In the first two he maintains that the verdict is contrary to the evidence and to law and that the deliberation and malice aforethought, indispensable ingredients of murder in the first degree, were not adequately established.

"The evidence for the prosecution," according to the correct summary made by the Solicitor General, "showed that the defendant–appellant had known the victim for a long time. The father of the defendant–appellant had been imprisoned after a trial in which the victim testified as a witness for the prosecution. On different occasions the victim had expressed his fear of retaliation by the father of the defendant-appellant upon his release from prison. In this connection, Francisco Villanueva Santiago, witness for the prosecution, testified that on the very day of the occurrence the victim said in the presence of the defendant–appellant the following: 'I have to hide under the bed because I am being watched, because his father will be released, because he said he was going to beat me.' To which the defendant-appellant answered, 'If he is not man enough like myself, I too can kill you' (Tr. Ev. 49), and 'if you do not watch out, I'll kill you,' and 'if he is not man enough for that, I can kill you right now.' (Tr. Ev. 54.) Mariano Candelaria Ortega, witness for the prosecution, also testified that on a certain occasion the defendant–appellant said to him that he was going to kill 'that guy Alcides' and 'that if he did not kill him, he would kill anyone on that boundary over there.' (Tr. Ev. 17.)

---

[1] The defendant appealed in his own right, but by order of May 16, 1958 we designated attorney Joaquín Lago Padín to render him legal assistance to enable him to exercise fully his right to appeal. The said attorney complied painstakingly with our order.

"On the day of the occurrence the defendant–appellant was in the store of Emilio Olavarría when Alcides, his victim, arrived and remained outside. The former came out of the store and said to him, 'Come here,' that he approached him and slapped him; instantly he took out a double-edged poniard and inflicted him three wounds without exchanging any words. The last wound caused Alcides' death the following day. The evidence for the prosecution also showed that in the same evening of the occurrence the defendant–appellant admitted that he had killed 'someone.' (Tr. Ev. 37–40.)" (Statement of the Solicitor General, p. 3.)

The appellant argues that the evidence for the prosecution was "highly biased and prejudiced," and that none of the witnesses for the prosecution "sheds any light to enable the jury to determine whether there was malice aforethought and premeditation to make the murder first-degree murder." His contention is based on alleged contradictions in the testimony of the witnesses for the prosecution.

■■ The jury has under the law power to judge of the credibility of the witnesses, and we will not disturb its findings unless it is shown that it abused such power in giving credit to the witnesses for the prosecution, *People* v. *Ramírez*, 50 P.R.R. 224; *People* v. *Bartolomei*, 70 P.R.R. 664, 671. The mere fact that there is some contradiction in a witness' testimony does not bind the jury to reject the rest of his testimony, since, as correctly maintained by the Solicitor General, the maxim *"falsus in uno, falsus in omnibus"* does not apply in this case. *Ortiz* v. *Martorell*, 80 P.R.R. 525, 529; *People* v. *Soto*, 73 P.R.R. 52, 77; *People* v. *Portalatín*, 72 P.R.R. 145; *People* v. *Roque*, 53 P.R.R. 875; *People* v. *Ortiz*, 45 P.R.R. 810.

■ On the other hand, the evidence for the prosecution contains the ingredients of malice aforethought and deliberation. According to that evidence, there was no provocation nor assault on the part of the victim, and the defendant

had already made statements in the sense that he was going to kill Alcides, the victim. In *People* v. *Túa*, 84 P.R.R. 37, 55 (1961), we said:

"To state that one is going to kill another is unquestionably an affirmative fact on which the jury may expressly determine malice aforethought: the manifestation of a deliberate intention to take away the life of a fellow creature, *cf. People* v. *Gorshen*, 336 P.2d 492; *People* v. *Cox*, 153 P.2d 362; *People* v. *Greig*, 95 P.2d 936—malice aforethought being an ingredient of murder, whether of the first or second degree. *Cf. People* v. *Lewie*, 344 P.2d 861; *People* v. *Cayer*, 228 P.2d 70; *People* v. *Bender*, 163 P.2d 8. Such statement may also be a fact from which the jury may infer a deliberate and premeditated death—a sole characteristic of murder in the first degree— depending on all the other facts and circumstances appearing from the evidence; a death which requires a process of meditation and thinking; turning the fact in the mind, weighing the decision to kill and the reasons for and against a certain course of action to be taken and conscious of its consequences, and a specific intention to kill as a result of such process of meditation and thought."

The first two errors were not committed. The third challenges, as prejudicial error to the defendant, the following instructions transmitted to the jury:

"In other words, gentlemen of the jury, there is a dividing line, there is a boundary, a borderline between murder in the first degree and murder in the second degree, and that borderline consists in the deliberation. There being no deliberation, that is, if there is no plan to kill, there is no first degree. Then there is second degree.

"I must tell you, in order that you may bear it in mind, what is meant by premeditation. According to the authorities of Puerto Rico and the law, the term premeditation means that the act was preconceived and carried out after reflection; and the term deliberation, which I characterized as the borderline between first and second degree, means a state of serenity and cold-bloodedness. It does not mean to calculate or reflect during a long time, but an intention or purpose to kill carried out by the defendant in a state of serenity as a consequence of the deliberate purpose to satisfy a passion or vengeance. With

these two concepts of malice aforethought and premeditation which I have explained, you have a basis for weighing with serenity, without any prejudice, the evidence in this case." (Argument of the Solicitor General, p. 5.)

In arguing this error, the appellant states as follows:

"In our judgment, the Hon. Judge, in giving these instructions to the ladies and gentlemen of the jury, confused deplorably the terms 'deliberation and malice aforethought' in identifying erroneously the term 'deliberation' with the phrase 'intent to kill'. From the explanation which the Hon. Judge made to the jury in defining what is meant by 'deliberation' to the effect that 'it does not mean to calculate or reflect during a long time, but an *intention or purpose* to kill . . . ,' the jury, laymen as they are in such an intricate matter, would reasonably infer that since the act was perpetrated with the purpose or intention of killing, the offense committed *would* have to be one of first degree. The Hon. Judge did not explain to the jury, as was his duty, that the plan to kill may exist without deliberation, in which case the murder would not be in the first degree but in the second degree." (Argument of the Solicitor General, p. 5.)

He is right. In *People* v. *Blanco*, 77 P.R.R. 726, we said that the specific intention to kill is an ingredient of murder in the first degree, and that such specific intent to kill may be present also in murder in the second degree, although it is not always necessary. The jury could have perfectly inferred in this case that if there was a plan to kill, the murder was first-degree murder and that if there was no such plan the murder was of the second degree. Therefore, if the jury should find that the defendant inflicted the wounds on the victim with the purpose of killing him, the offense committed would necessarily be murder in the first degree. Neither the other instructions given to the jury on the meaning of deliberation nor those on the degrees of the offense and the different verdicts which they could bring in our opinion, cured, the error committed.

The record discloses another gross error which is prejudicial to the appellant. Although such error has not

been assigned nor were the actions involved in that error duly objected to in the trial court, we must consider it in passing upon the appeal particularly since the judgment appealed from is one of life imprisonment and the aims of justice are better served thereby.[2] We refer to the continued and unjustified interference of the judge with the witnesses, questioning them intensively, even before the district attorney and the defense attorney were through with their examination. The defendant himself, who testified in self-defense, was subjected to acrimonious questioning by the judge for the purpose of contradicting and discrediting him before the jury, thereby depriving him of a fair and impartial trial. What the record does reveal is that the judge skillfully displayed in this case the mission reserved by law to the prosecuting attorney. Let us examine the record.

The first eyewitness of the facts presented by the district attorney was Mariano Candelaria Ortega. In the course of the examination by the district attorney the judge interrupted on several occasions with questions ·aimed at identifying "the small poniard" which the witness claims the defendant was carrying. When the defense attorney was cross-examining the witness, the judge interrupted him with the following interrogatory:

"Upon questioning by the Hon. Judge, he testified:

Q. You just answered to the attorney that you did not see what he is showing you, except the handle? —Yes, sir.

Q. When he had it stuck in the thatch of the house? —He asked me about the bosom.

Q. When he carried it in his bosom? —Yes, sir.

Q. How was the roof of the house? —It's a small thatch-roofed house. It's a small house and this is the door, and the knife is stuck in the last tier of the thatch.

---

[2] Regarding our power to take cognizance of and decide fundamental errors in the record, even though no objection has been raised thereto, see 4 L.P.R.A. § 36; 34 L.P.R.A. § 1171; *People* v. *Túa*, 84 P.R.R. 37 (1961), footnote 8, and cases therein cited.

628

Q. What do they call that, the bristles? —Yes, sir.

Q. Did he have it there? —Yes, sir.

Q. When you say that this defendant had called Alcides in front of the store, that Alcides came down, you say that the defendant attacked him with the poniard, that he wounded him with the poniard, did you see the poniard? —I saw him when he thrust at him. He came down from the store, the defendant, and he called Alcides who was talking to me.

Q. When he assaulted him, what did you see? —He said to Alcides, 'come here.'

Q. I don't want you to repeat that. I want you to tell me if you saw when he assaulted Alcides? —Yes, sir. I saw when he did like this.

Q. Did you see him? —I did not see the poniard, but I saw when he did this.

Q. Didn't you see any weapon in his hands? —I did not know if it was a poniard or a knife.

Q. You saw him doing this? —Yes, sir.

Q. And that he injured him? —He thrust at him.

Q. How many times did he thrust at him? —Three times.

Q. About the poniard which you saw stuck in the thatch of the roof of the house and which you saw in his bosom while he was talking under the mango tree, what did the handle look like? —The handle could be seen from the outside.

Q. What was it like? —I could see it from the outside.

Q. What was it like? A colored iron-handle like this? —Rust color, because it was rusty.

Q. Was it smooth or did it have any design? —I did not see that.

Q. Smooth? —Yes, sir.

Q. When did Alcides fall to the ground, as the defendant assaulted him, when he thrust the knife at him, as you say, the first time, the second time, or the third time? —The third time.

Q. How did he fall? —He fell like this, on his face.

Q. Where did you see him? —I dashed out in order to pick him up.

Q. Did you see him? —Yes, sir.

Q. On the floor? —Yes, sir.

Q. Did you see any blood? —Yes, sir.

Q. Did you see blood? —I saw blood.

Q. Did you see blood? —Yes, sir.

Q. Did you see any wound? —When I picked him up, by the arm, when I grabbed him in order to pick him up, then I noticed the stab wounds.

Q. How long were you there? —When I went to pick him up.

Q. How long were you there with him, when you saw him wounded? —About one minute because Cecilio Morales arrived and said to me, 'go and fetch a car to take him,' and then I went for it.

Q. Did you bring the car? —They had already taken him in another car.

Q. Where did you go? —To La Palma.

Q. Did you go into town? —I went in the evening when they went to get me.

Q. After seeing Alcides on the ground, did you see him again? —No, sir, because they took him away because they took him to the District Hospital.

Q. Did they take him back to the ward where he lived? —They took him.

Q. Alcides? —They did not take him the same day. The next day they took him to his grandfather's house.

Q. Was he dead? —Yes, sir.

Q. Did you see him? —Yes, sir, I saw him dead in the house when they brought him in the coffin.

Q. Did they bury him? —Yes, sir.

Q. When? —The next day.

Q. Did they have a wake? —Yes, sir.

Q. Were you there? —Not at the wake.

Q. And to the funeral? —No." (Tr. Ev. 31–35.)

William Sierra Morales, the next witness for the prosecution, testified that on the day of the occurrence he was in his sweetheart's house talking to her when the defender arrived and said: "Ana, please open the door. I killed a person and I was wounded." The defense attorney asked the witness whether or not it was true that he quarrelled with the defendant because he beat his wife and the de-

fendant intervened in her defense. The witness answered that he did not, that that was not true. The judge interrupted with the following interrogatory:

"Upon questioning by the Hon. Judge he testified:
Q. Have you ever beaten your wife? —No, sir.
Q. Have you had violent quarrels with her? —No, sir.
Q. You have been a good husband and treated her well? —Of course."

The witness' interrogatory ended at this point, and after the noon recess Francisco Villanueva Santiago took the witness stand and testified that he had witnessed the facts and had heard the threats which the defendant uttered against the victim. In the course of the examination by the district attorney on these facts, the judge interrupted with the following interrogatory:

"Upon questioning by the Hon. Judge, he testified:
Q. What facts did you witness? —The facts that I witnessed, that he threatened him early in the afternoon. Later they ran into each other.
Q. Did you see them together afterwards? —Yes, sir. We were all together.
Q. Where? Where did you see Alcides and the defendant together? —In the house of Chago Pérez they were together.
Q. Did anything happen there? —Nothing had happened between them. The only thing he said, 'Pey is ready to come out and I will have to hide.'
Q. We want you to tell what you yourself saw directly between Alcides and the defendant. —Nothing happened between them.
Q. What did you see between them? —I know that this one took out a knife in order to cut him.
Q. Whom? —Alcides.
Q. Where was Alcides as respects the defendant? —He was next to the store.
Q. At a distance? —No, sir.
Q. Close to this young man? —He was on the road leading from the wife's house.

Q. Were they close to each other? —Yes, sir. Very close.

Q. When they were near, what did you see between them? —That this one slapped him and thereupon he pulled out and injured him right away.

Q. When this one slapped the other one, what happened, what happened right away? —That this one wounded him. That is all. After that, I don't know anything else.

Q. When this one slapped him? —He pulled out the knife and cut him.

Q. After he slapped him, right away? —Right away.

Q. Didn't the other one jump on this one? —No.

Q. That one did not slap him back? —No, sir."
(Tr. Ev. 51–53.)

When the attorney was asking the witness to explain how the defendant injured himself, the judge again interrupted and closed his examination with the following questions:

"Upon questioning by the Hon. Judge, he testified:

Q. Who else was traveling in the car with the deceased, your nephew Alcides, this defendant? —Myself, this one, Toño Aletriz, his cousin, were in the car.

Q. While all were traveling in the car, did you talk about anything? —We did not talk about anything.

Q. Did the defendant say anything? —No, sir.

Q. Did Alcides say anything? —He did not talk. He was already coming, he did not even say a word. He did not say, 'it hurts here,' nor complained at any time.

Q. You said that you went to the hospital with Alcides? —Yes, sir.

Q. At about what time did you arrive at the hospital? —I believe it must have been about ten.

Q. Did you see him again? —I did not see him again because I did not go back.

Q. Didn't he go back there? —They took him there two days later.

Q. How? —In the coffin.

Q. In what coffin? —When he died.

Q. From the hospital he went back dead? —Yes, sir.

Q. Did you see him dead? —Yes, sir." (Tr. Ev. 57–58.)

Cecilio Morales Soto, the last witness for the prosecution, was submitted by the judge, for no reason at all, to the following interrogatory:

"Upon questioning by the Hon. Judge, he testified:

Q. Where were you? —Up in the store of Emilio Olavarría.

Q. Were you a clerk? —No, sir. I arrived at that moment.

Q. While you were in the store, did you see Alcides and the defendant? —I saw them when they came out of the store in this direction.

Q. That same day in the afternoon? At that moment, shortly before the wound which you saw, you said to the attorney that you saw when this defendant inflicted him a wound in may God save the place? —Yes, sir.

Q. Had you seen them before that? —They were up in the store. I saw them when they came down.

Q. When they came down, he had not yet inflicted the wound on the groin? —No, sir, that was on the way.

Q. Did you see them all the time since they came down? —Since I did not know anything. I saw them when they came down. I was sitting down.

Q. Did you follow them? —No, sir.

Q. Did you continue to look as they came down? —No, sir. I remained in my seat and when he was at the door I saw him inflict the wound.

Q. So, you did not see any motion which they or either of them made before inflicting the wound? —No, sir.

Q. Before seeing the poniard? —I saw that he had it in his hand and did this.

Q. Did he fall right away? —Yes, sir.

Q. Alcides? —Yes, sir.

Q. Who had the poniard in his hands? —Luis Aletriz.

Q. And what did he do? —He stabbed and dashed out running.

Q. And you? —I stayed with the boy until the one who put him in the car arrived.

Q. Did you accompany the injured party? —No, sir, I went home.

Q. Do you know William Sierra? —Yes, sir.

Q. Did you see William Sierra that night? —That night, after the wounds.

Q. Did you see him? —Yes, sir. After everything was over.

Q. Did you see the defendant? —Yes, sir.

Q. Did you see William and this young man together? —They were coming in the same car in which they took the deceased.

Q. Did you see him, William, and the defendant together at the time of the wounds? —No, sir, I saw him afterwards in court." (Tr. Ev. 64–66.)

The defendant's theory was his own defense. In support thereof, he relied mainly on his own testimony. In the course of his testimony the judge questioned him several times. Part of that interrogatory was aimed at contradicting and discrediting him before the jury. Let us go back to the record. The defendant had testified that his assailants had stolen his wallet containing $47. The judge asks him:

"Upon questioning by the Hon. Judge, he testified:

Q. What about the $47 which were stolen? —They pulled me in order to take the $47.

Q. Did you discover it the same night? —I discovered it.

Q. Where did you keep them? —In the back pocket, in a wallet, and they took them from the wallet.

Q. Who was the person who stole the wallet? —I imagine it was Juan Feliciano who grabbed me by the back when I fell to the floor, when William Sierra kicked me.

Q. Don't you know who did it? —It had to be one of them.

Q. Did you feel anyone rummaging in the pocket? I did not because I was stunned. I imagine it must have been one of them because they grabbed me and held me tight.

Q. Did you feel that you were being rummaged, but you do not know who did it? It must have been they, they were eight or nine, and I did not know.

Q. I want to know if you realized at that moment that they were going through your pocket, if you knew the person, or if you did not notice that they were going through your pocket? —Since my mind was like that, sort of stunned, and I could not move my head, then I felt when this Juan Feliciano grabbed me by the shirt and when he

pulled me back I felt a movement, and it had to be them because there was no one else there. When I fell the first time, when they hit me with a club, William Sierra came and kicked me and I fell again to the floor." (Tr. Ev. 81–82.)

On examination by the district attorney, the defendant was testifying that he saw the poniard for the first time in Olavarría's house on the day of the occurrence. The judge interrupted and proceeded with the following interrogatory:

"Upon questioning by the Hon. Judge, he testified:

Q. Did you find the knife in Emilio's house? —Yes sir, on the road.

Q. Are you sure of that? —Yes, sir.

Q. Is it a knife or a poniard? —A poniard.

Q. You know about that? —It is a poniard.

Q. Since this was the poniard which you found in Emilio Olavarría's house, my question is, was this the same poniard with which you wounded Alcides? —What do you say?

Q. Having already said that you found this poniard in the store of Emilio Olavarría, whether this was the same one with which you injured Alcides? —I can not tell if that is the one. I can not tell whether it was that one or which one. I found the knife.

Q. This same one? —I can not tell.

Q. Was this the same poniard which you found? —I don't know if that was the one.

Q. Didn't you just say that you saw this poniard for the first time in the store of Olavarría where you found it? I did not see it in the store. On the road.

Q. Is this what you found? —Yes, sir.

Q. When you found it, you had already been clubbed? —Yes, sir.

Q. And you found it on the floor after the beating? —When I struck back and ran upstairs and I got up, I found the knife.

Q. This same one? —Yes, sir.

Q. Are you sure? —Yes, sir.

Q. This same one? —Yes, sir.

Q. This was the one which you used and you referred to this knife when you said that you wounded Alcides with a knife which you found in that place? Was it this one? —That was the one.

Q. If this was the same one which you found, as you told the jury, you said at the beginning that this knife belonged to you and that you had it? —I did not say that I had it.

Q. You did not say that you recognized it as your own? —Not as my own. I found it on the floor.

Q. Did you injure him with this? —Yes, sir. It must have been that one.

Q. Why did you say that you can not tell which one was it? —... (Does not answer.)

Q. You said that this was not the knife with which you wounded Alcides, that this was not it, that it was another one? —... (Does not answer.)

Q. Didn't you say a while ago, on another occasion, that it was not with this but with another one? —I can not say.

Q. You say that you did not see Alcides dead? —I did not see him dead because I was in prison.

Q. In the car, in the same car in which you were coming, was not Alcides dead? —No, sir. He was alive, but he died when we arrived at the District Hospital.

Q. Did he say anything? —I don't know if he said anything. I was all smeared with blood and stunned because I was out of my mind. I don't know if he said anything or not.

Q. You did not say anything either? —No, sir.

Q. Can you tell the jury where they sutured your ear? —Yes, sir.

Q. Step down there and show the jury. How many stitches did they take? —I don't know.

Q. You don't know? Didn't they treat you? —Sure. But I don't know.

Q. Why do you say that they sutured there? —How do I know if I was lying down.

Q. Didn't you feel the pinching? —I did not feel the pinching.

Q. Didn't you feel when they pinched you to do the stitching? —No, sir." (Tr. Ev. 88–91.)

The defendant continues to testify upon questioning by the district attorney, and the judge terminated the interrogatory as follows:

"Upon questioning by the Hon. Judge, he testified:

Q. What is the name of William's sweetheart? —Her name is Carmen Lydia Ortiz.

Q. What is Carmen Lydia Ortiz to your wife? —She is my wife's niece.

Q. That is, Carmen Lydia is your wife's niece? —Yes, sir.

Q. And Carmen Lydia lived in your house? —No, sir. She used to come to my house when I lived with my wife. Some times she went when she was sick and cooked dinner and lunch for her.

Q. On December 7, 1957, Carmen Lydia was there in your house? —(Does not answer.)

Q. What day of the week was that day? —I do not know what day of the week it was. I believe ...

Q. The week has seven days? —I don't know if it was Friday or Saturday.

Q. What day of the month was it? What date of the month was it? —The seventh.

Q. Eighth, ninth, or tenth? —The seventh, I was told.

Q. What you do know. You have no idea what day it was? —Since I don't know about dates.

Q. You know about days of the week? —Because we worked.

Q. You work from Monday till Friday? —Yes, sir.

Q. And Saturday pay day and rest? —Yes, sir.

Q. The day of the occurrence, was it Saturday or Sunday? I do not recall if it was Saturday or Sunday. It was Saturday.

Q. Then Lydia, William's sweetheart, was in your house that day? —I have no house. My small house is down there in Planas. I have no house there.

Q. Where did you go immediately after the occurrence, after coming out of the store and after that happened, that you

found that knife and that they jumped on you and they stole your $47? —Nowhere. I do not recall having gone to any other place.

Q. Did you remain there? —I left in the car with the injured from the store of Emilio Olavarría.

Q. Where were you going, for what purpose did you take the car? —To the District Hospital.

Q. The car stopped at the District Hospital, but how far did you want to go? —They brought me for treatment.

Q. Didn't you go to the Hatillo police headquarters? —No, sir. I do not remember.

Q. Did you go to Hatillo police headquarters? —Yes, sir. They tell me that I did, but I do not remember. I asked my wife if she brought me and what we did, and she told me that that evening they took me to police headquarters and asked me many questions, and since you were stunned you testified.

Q. Don't you know if you went first to the headquarters? —I don't remember what I did.

Q. Is the house of William's sweetheart near your house? —The house of William's sweetheart is quite far.

Q. Is she a relative to you or to your wife? —I did not visit that house.

Q. Was she a relative of your wife? —Yes, sir.

Q. Was the house where William's sweetheart slept and lived far away? —From the woman who was my wife.

Q. That blonde man with a big wave, do you remember him? —Yes, sir.

Q. Where did he visit his sweetheart? —Since he is married to a cousin of mine and he left her, because he slapped her and she had to leave him because he made her life miserable and had an affair with another girl.

Q. She is a cousin of your wife? —The one I told you about.

Q. What about this new girl? —This new girl who had an affair with him.

Q. Does she live near your house? —No, sir.

Q. Far? —Far.

Q. What house is near the house of Lydia where you went that night? —None.

Q. There is no other house nearby? —No, sir.

Q. Who were the women who screamed there when you said that you had killed someone? —I never said that I had killed someone.

Q. Or that you injured someone? —I did not say that either.

Q. When did you say that you had been injured? —It was in front, farther down Emilio's store.

Q. What family lived there? —That same family.

Q. What family? —The one you say.

Q. William's family? —William's sweetheart.

Q. Did you not say that your $47 had been stolen there? —Of course not. At that moment I did not say anything.

Q. But you said that you had been wounded, that you had been wounded? —Of course. But that was up here, not down there.

Q. And did William go out of the house? —I can not tell that.

Q. Did he go out and come to you? —Where?

Q. In order to help you pick up the poniard? —No, sir. I did not see him help me look for the poniard.

Q. Did you hear him testify? —Yes, sir." (Tr. Ev. 97–100.)

There is no question that the judge's interference in this case went even further than that which we disapproved in *People* v. *Acevedo*, 35 P.R.R. 886, and *People* v. *Bartolomei*, 70 P.R.R. 664. In the former we said at p. 890:

"The conduct of the case for the government, however, especially in jury trials, should be left to the district attorney. Otherwise excessive interference by the court, if the general trend of the questions propounded and comments made is favorable to the prosecution, is calculated to prejudice the minds of the jury against the defendant and when considered in connection with other circumstances in the case may lead to the inevitable conclusion on appeal that the accused has not had a fair and impartial trial."

In the *Bartolomei* case we cited with approval part of the language employed in *People* v. *León*, 53 P.R.R. 408, to the effect that: "The judge can put any question to

a witness which he believes necessary in order to clear up, in the furtherance of justice, any point which may have been left obscure after the examinations by the prosecution and by the defense; but he should not examine a witness for the purpose of contradicting or discrediting him before the jury. This mission is left to the prosecuting attorney and to defense counsel."

 In order to prove that the judge in this case tried to contradict the defendant and discredit him before the jury, it is well to recall, in addition to the examination on the manner in which the defendant's wallet was stolen, the following questions:

"Q. Is it a knife or a poniard? —A poniard.
Q. You know about that? —It is a poniard."

There is no question that the purpose of the question was none other than to present the defendant before the jury as a man who knows about *poniards*, which is a weapon used for killing.

"Q. Was this the same poniard which you found? —I don't know if that was that one.
Q. Didn't you just say that you saw this poniard for the first time in the store of Olavarría where you found it? —It did not see it in the store. On the road."

This question was aimed at contradicting the witness, or at least to emphasize the fact that the witness was incurring a contradiction. But the purpose sought by the examination appears more clearly from the following questions:

"Q. Did you say that you recognized this poniard as your own?
Q. With this you wounded him?
Q. Why do you say that you can not tell with which one it was?
Q. Didn't you say a moment ago, on another occasion, that it was not with this, but with another one?"

We need not analyze further the extensive examinations to which the judge submitted almost all the witnesses in order to show that his actions deprived the defendant of a fair and impartial trial. The fact that a case for carrying weapons was being tried together with a murder case did not warrant the judge's interference with the witnesses in that fashion.

The judgment appealed from will be reversed and a new trial is ordered.